INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation, Plaintiff,

v.

Leon B. BROWN, an individual, RPM Computer Ribbon Corporation, a California corporation, Gilbert Romoff, an individual, CCP Enterprise, Inc., a California corporation, dba Advanced Data Products, Inc., Henry Cho, an individual, Matthew Cho, an individual, Reggie Parrott, an individual, C.C.D. Inc., a California corporation, dba California Computer Designs, Inc. and Computer Craze Distributing, Rajeev K. Dhingra, an individual, Defendants.

No. CV 92–4974 JSL.

United States District Court, C.D. California.

July 14, 1994.

Seth Aronson, Paul F. Douglas and Diana M. Torres, O'Melveny & Myers, Los Angeles, CA, for plaintiff.

Leon Brooks Brown, in pro per.

Reggie Parrott, in pro per.

Robert H. Thau, Rosenfeld, Meyer & Susman, Beverly Hills, CA, for defendant RPM & Romoff.

Kenneth J. Catanzarite, Catanzarite Law Corp., Anaheim, CA, for defendant CA Computer Designs and Rajeev K. Dhingra.

## ORDER AND OPINION

LETTS, District Judge.

This matter came before the court on February 10, 1994, on the motion of defendants Gilbert Romoff and RPM Computer Ribbon Corporation, joined by defendants Rajeev Dhingra, California Computer Designs, Inc. and Reggie Parrott. Defendants ask the court to stay or continue these proceedings pending the resolution of parallel state court criminal actions involving the same transactions involved in this case.

For the reasons set forth below, defendants' motion is DENIED.

### I.

### BACKGROUND

Plaintiff International Business Machines Corporation ("IBM") alleges in its complaint that on or about October, 1991, it began to suspect fraud in the pending sale of approximately $5 million in IBM computer products to a fictitious entity controlled by defendants

CCP Enterprise, Inc. dba Advanced Data Products, Inc. ("ADP") and its principals, defendants Matthew Cho, Henry Cho and Reggie Parrott. The sale transaction was initiated at IBM by one of its employees, defendant Leon Brown. While this transaction was in progress, IBM reported the suspected fraud to the Los Angeles Police Department ("LAPD"). The LAPD conducted an undercover operation, whereby IBM allowed some of the products to be shipped as planned by the defendants. On October 7, 1991, after ADP accepted the shipment of IBM products, the LAPD intervened, recovered the products, executed a search warrant at ADP's offices and arrested Mr. Brown.

When the LAPD searched ADP's offices pursuant to the warrant, they discovered and seized additional IBM computers, typewriters and associated computer and typewriter supplies. Matthew Cho, who was present during the search, confessed in writing to the LAPD his involvement in a conspiracy between ADP, Henry Cho, Reggie Parrott and Leon Brown to defraud IBM of millions of dollars worth of IBM products. Matthew Cho told the LAPD of additional transactions in which many other IBM products were fraudulently diverted by Leon Brown to the ADP defendants.

As a result of the LAPD's investigation, Leon Brown was charged in the Los Angeles Superior Court with 42 felony counts of grand theft, computer fraud and conspiracy to commit grand theft. In preparing its case against Mr. Brown, the Los Angeles District Attorney's office asked IBM to assist it in tracing the path of the stolen IBM products and to explain various IBM documents found at ADP's offices. The alleged activities of Mr. Brown were secretive and extraordinarily complex, involving scores of fraudulent transactions accomplished by manipulating IBM's internal ordering processes in a variety of ways. The prosecutors looked to IBM for assistance in identifying the stolen property and understanding how IBM's computer ordering systems were manipulated. In connection with the investigation, IBM was permitted to review and photocopy certain documents seized by the LAPD at ADP's offices.

Mr. Brown eventually pleaded *nolo contendere* to the 42 felony counts and was sentenced to five years in prison. On August 19, 1992, IBM filed its civil complaint in this action against Leon Brown, ADP, Henry Cho, Matthew Cho and Reggie Parrott, as well as Gilbert Romoff and his corporation, RPM Computer Ribbon Corporation ("RPM"), and Rajeev Dhingra and his corporation, California Computer Designs, Inc. ("CCD"). In sum, IBM's complaint asserted that all defendants conspired and participated in racketeering activity so that Leon Brown could divert IBM computer products to the other defendants at little or no cost to such defendants. On October 28, 1993, this court issued an order setting discovery cutoff for January 1, 1994, and scheduling the Pre–Trial Conference for January 13, 1994, and the jury trial for February 1, 1994.

In December, 1993, the Los Angeles Superior Court issued warrants for the arrests of Reggie Parrott, Gilbert Romoff, Rajeev Dhingra, Henry · Cho and Matthew Cho. Reggie Parrott, Gilbert Romoff and Rajeev Dhingra were arrested in early January, 1994, and arraigned on January 27, 1994. Henry Cho and Matthew Cho have not been located and reportedly are fugitives. A Preliminary Hearing for these defendants was scheduled by the Los Angeles County Superior Court for March 28, 1994. Each of the defendants was charged with felony counts of grand theft, receiving stolen property, conspiracy to commit grand theft and conspiracy to receive stolen property. Each count arises from the same transactions alleged by IBM in this civil action.

At the January 13, 1994 Pre-trial Conference, defendants informed the court of the pending criminal proceedings and requested a stay or continuance to allow defendants to address issues presented by the criminal charges. The court continued the trial to February 22, 1994.

On February 3, 1994, defendants RPM and Romoff, joined by defendants CCD, Dhingra and Parrott, again moved the court for an order staying or continuing these proceedings until after the resolution of the criminal proceedings. Defendants argued they would be prejudiced by having to choose between

testifying in the civil case and thereby waiving their Fifth Amendment rights against self-incrimination, or asserting those Fifth Amendment rights and thus being subject to adverse inferences at the civil trial. The defendants also claimed that IBM and the District Attorney's office have benefitted unfairly from IBM's cooperation with law enforcement officials.

## II.

## DISCUSSION

### A. DEFENDANTS HAVE NO CONSTITUTIONAL RIGHT TO A STAY OR A CONTINUANCE OF THESE CIVIL PROCEEDINGS

■ Defendants are not entitled to a stay or continuance of this civil litigation merely because criminal charges also are pending against them. Indeed, it is well established that parallel civil and criminal proceedings can be brought and pursued against the same defendant "simultaneously or successively." *Standard Sanitary Mfg. v. United States,* 226 U.S. 20, 52, 33 S.Ct. 9, 16, 57 L.Ed. 107 (1912). The rule has emerged that "[i]n the absence of substantial prejudice to the rights of the parties involved, such parallel proceedings are unobjectionable." *S.E.C. v. Dresser Industries,* 628 F.2d 1368, 1374 (D.C.Cir. 1980), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980); *see also United States v. Kordel,* 397 U.S. 1, 11–12, 90 S.Ct. 763, 769–70, 25 L.Ed.2d 1 (1970) (holding that defendant, who answered interrogatories and failed to invoke his Fifth Amendment privilege, could not assert that he was compelled to give testimony against himself as ground for overturning conviction).

■ Refusing to stay a civil case while parallel criminal proceedings are pending is left to the sound discretion of the district court. *Dresser Industries,* 628 F.2d at 1375. The court will first review the applicability of California Penal Code § 1524, which provides for the confidentiality of information only in limited situations. The court will then consider the factors identified by the Ninth Circuit in *Federal Savings and Loan Ins. Corp. v. Molinaro,* 889 F.2d 899 (9th Cir.1989), which provides district courts with guidance when confronted with a motion to stay. Those factors include: the extent to which the Fifth Amendment is implicated and the burden on the defendant of proceeding with the action; the interest to the plaintiff in proceeding expeditiously and the prejudice to plaintiff of a delay; and the interests of the court in managing its docket. *Molinaro,* 889 F.2d at 902–3. After considering all of these factors, this court finds no basis for a stay.

### B. THIS CASE PRESENTS NO BASIS FOR A STAY

■ The position in which defendants have been placed by this denial of a stay is the rule, rather than the exception, whenever criminal and civil cases are pursued simultaneously. If either of defendants' general contentions regarding the misconduct of the plaintiffs or the prejudicial nature of the proceedings were correct, then it should be the rule rather than the exception to stay the civil proceedings. This court finds no merit in either contention generally, or as applied specifically, to this case. Moreover, a stay of this action undoubtedly would prejudice the plaintiff and impose an unnecessary burden on the court's calendar. Therefore, the case should proceed as scheduled.

#### 1. *Civil Litigants Are Entitled To Cooperate With Law Enforcement Agencies*

The thrust of defendants' motion is their unsubstantiated proposition that IBM and the LAPD engaged in unspecified acts of misconduct while investigating this case. Defendants, however, failed to identify a single instance of police or prosecutorial misconduct or show that IBM did something other than properly pursue its civil remedies.

■ First, defendants claim that the documents seized by the LAPD at ADP's offices, pursuant to a valid search warrant, should have been retained as confidential and cite California Penal Code § 1524(d) for support. However, § 1524(c) applies only to documents obtained by a warrant from the possession of a lawyer, physician, psychotherapist or clergyman, providing in relevant part:

**1388**

(c) ... [N]o search warrant shall issue for any documentary evidence in the possession or under the control of any person who is a *lawyer* ..., a *physician* ..., a *psychotherapist* ..., or a *clergyman* ... unless the following procedure has been complied with:

(1) At the time of the issuance of the warrant the court shall appoint a *special master* in accordance with subdivision (d) to accompany the person who will serve the warrant....

Cal.Penal Code § 1524(c) (emphasis added). Section 1524(d) addresses the information obtained by a special master:

(d) ... Any information obtained *by the special master* shall be confidential and shall not be divulged except in direct response to inquiry by the court.

Cal.Penal Code § 1524(d) (emphasis added).

A special master may be appointed only when police seek documents in the possession of a lawyer, a physician, a psychotherapist or a clergyman pursuant to § 1524(c). No special master was appointed here since none of the documents seized by the LAPD was taken from a lawyer, physician, psychotherapist or clergyman. Thus, § 1524 is wholly inapplicable to the documents seized from the ADP defendants. Defendants offer no support for the proposition that the prosecutors were required to keep confidential the evidence they obtained during the course of their investigation.

Similarly, nothing in § 1524 prohibits the police or the district attorney from obtaining evidence from private citizens such as IBM—even where such citizens obtained that evidence from the defendants. So long as the *government* does not compel testimony or the production of documents from the defendant, the prosecution's discovery of incriminating evidence does not violate the defendant's state or federal rights. *See People v. Superior Court,* 231 Cal.App.3d 584, 591–93, 282 Cal.Rptr. 418 (1991).

The court finds that nothing that the defendants claim IBM or the prosecutors did was remotely improper. Under § 1524(a), a warrant was issued for the stolen IBM property and for other evidence of the theft. The

LAPD properly seized those documents for use as evidence under § 1524(b), and retained that evidence under § 1536. Merely allowing IBM to view and photocopy documents violates no statutory or constitutional right of defendants.

With defendants' statutory arguments disposed of, all that remains are defendants' unsupported allegations that IBM and the prosecutors engaged in unspecified acts of misconduct. Defendants presented no evidence of misconduct. Mere allegations of prosecutorial impropriety, with no supporting evidence, are insufficient to support a stay. *Comptroller of the Currency v. Lance,* 632 F.Supp. 437, 442 (N.D.Ga.1986), *citing United States v. Juren,* 687 F.2d 493, 494 (T.E.C.A.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983). The true thrust of defendants' motion, in fact, is that there is something inherently outrageous in the fact that plaintiff, having discovered circumstances which indicated that it was being defrauded, first complained to the LAPD, thereby triggering a criminal investigation, and then proceeded with a civil suit, which resulted in the sharing of information between the LAPD and plaintiff. The court disagrees.

The court notes that often it is difficult and virtually impossible for large corporate victims to secure prosecution of crimes committed against them, especially if they are unwilling or unable to make a significant contribution to the criminal investigation at their own expense. The result has been that crimes against large corporations may be committed with criminal impunity, subject only to the risk of civil recovery. This virtual lack of criminal exposure for white collar crime against large corporations may be partly responsible for a dramatic increase in business crimes over recent years. The effects of such an increase may be such ills as higher prices and loss of jobs.

This court believes that it is no solution to demand that government become more zealous about prosecuting crimes against large corporations without relying on aid from the victims. Realistically, in an age when crime is rampant and law enforcement resources are strained severely, there is no prospect of

government being able to meet such a demand. In addition, crimes against large corporations are not, and probably should not be, ranked at the top of the list of prosecutorial priorities. They normally do not involve physical violence, nor do they ordinarily involve "organized crime".[1] Moreover, large corporations are not themselves particularly vulnerable criminal victims, and the impact of business crimes against more vulnerable individual victims, as it affects jobs, stock values and consumer prices, is usually only indirect.

Large corporate victims do, however, have one advantage. They have the resources, if they choose, to help law enforcement agencies pursue and apprehend the criminals who victimize them.

Business frauds often involve very complex schemes. As a result, very large expenditures of funds and resources are often necessary before a *bona fide* suspicion of fraud can be affirmed. Where private investigation reveals that a crime has been committed, why should the government be precluded from using the investigation as a basis for prosecution simply because the government has not paid for it?[2] Conversely, where investigation leads nowhere and no prosecutable crime is revealed, what would be the virtue in having the wasted expense of the investigation borne by public funds rather than by private volunteers pursuing their own interests?

Therefore, this court sees no reason why those victims who have the resources and willingness to pursue their own investigation and enforce their own rights should be precluded either from doing so or from sharing the fruits of their efforts with law enforcement agencies. If the ultimate result of such private investigation is that criminals can be brought to justice with a minimum diversion of public resources, the interests of society are irrefutably served.

1. Business crimes committed by "organized crime" may constitute a minor exception to the rule that crimes against large business organizations are not prosecuted.

2. Defendants, of course, point out that the sharing of information in this case went not only from plaintiff to the government, but also from the government to the plaintiff. Although they

### 2. *Fifth Amendment Issues*

Defendants inappropriately assert that their Fifth Amendment right to remain silent in their criminal case was abridged because the court allowed plaintiff and LAPD to proceed in this manner, rather than staying the civil proceedings, once the court became aware of the criminal investigation. These abridgements, as seen by defendants, followed from their being forced to choose either to testify in the civil case, thereby waiving their right to remain silent in the criminal case, or to assert their privilege against self-incrimination in the civil case, thereby irreparably injuring their chance of prevailing on the merits of that case.

■ Defendants' Fifth Amendment claims have no merit either generally or as applied to this case. Indeed, defendants filed their motion less than three weeks before the trial date, claiming they were given the unpleasant choice of either testifying, or invoking the Fifth Amendment and risking an adverse inference in this action. *See Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (permitting an adverse inference to be drawn from inmate's silence at his disciplinary proceeding is not, on its face, invalid practice). However, the contention that being forced to choose between the compulsion to testify in a civil suit in order to avoid an adverse result on the merits undermines the right to remain silent in a criminal matter, while having surface appeal, will not stand analysis. While the "choice between testifying or invoking the Fifth Amendment may be difficult, ... it does not create the basis for a stay." *Comptroller of the Currency v. Lance,* 632 F.Supp. 437, 442 (N.D.Ga. 1986); *see also Gellis v. Casey,* 338 F.Supp. 651, 653 (S.D.N.Y.1972).

■ Even if it were a sufficient basis for a stay, there is no real Fifth Amendment

assert this fact as a particular outrage, it is no more than a red herring, at least in such a case as this, where a prosecution results. Indeed, if the prosecution proceeds before the civil trial, material information will become public. Therefore, there seems little reason to preclude the civil plaintiff from obtaining this information.

issue here. The corporate defendants, RPM, CCD and ADP, enjoy no Fifth Amendment privilege. *See George Campbell Painting Corp. v. Reid,* 392 U.S. 286, 288, 88 S.Ct. 1978, 1979–80, 20 L.Ed.2d 1094 (1968) (maintaining that the constitutional privilege against self-incrimination cannot be utilized by any organization such as a corporation). Individual defendants Romoff and Dhingra already have testified at deposition and therefore have no remaining Fifth Amendment privilege to assert. Where a defendant already has given partial deposition testimony on substantive issues of the case, the Fifth Amendment privilege is "negligible" and cannot provide the basis for a stay. *Federal Savings and Loan Ins. Corp. v. Molinaro,* 889 F.2d 899, 903 (9th Cir.1989).

Moreover, defendants have made no effort to demonstrate to the court how truthful testimony subject to the privilege in this case could be helpful to them in their defense on the merits.[3] This court, at least, would be unlikely to find it persuasive if they were able to do so.

Defendants can claim no unfair surprise at the recent filing of the criminal charges against them. Each defendant was represented by counsel and has known—or should have known—since October 7, 1991 of the likelihood that criminal charges would be brought for the very transactions involved here. IBM filed its complaint in August, 1992 for RICO violations, common law fraud and related claims. Although IBM's complaint seeks civil relief, the facts underlying those claims would likely, and indeed ultimately have given rise to criminal charges. Each defendant was alleged to have conspired with Leon Brown, who was arrested on October 7, 1991 and is serving a five year prison sentence for the very conduct that is the basis of this civil action. The recent criminal charges should have surprised no one.

■ Furthermore, it should not matter that the prosecutors waited to file criminal charges against the remaining defendants

until recently. The determination of when to file criminal charges is made by the prosecutor. Nothing in the record suggests that the timing of the criminal charges against the moving defendants was motivated by bad faith. The court is disinclined to grant defendants a stay simply because the prosecutors decided to file charges before, and not after, the civil trial. To rule otherwise would give defendants an unfair advantage by allowing them to use the shield of the Fifth Amendment as a sword to delay the civil action.

Reduced to its essence, defendants' Fifth Amendment claims amount to the simple suggestion that they should enjoy some advantage in their civil case which they would not have if there were no criminal investigation pending against them or if they remained unaware of it. The flaw in this position seems obvious. Since the Fifth Amendment privilege exists and may be claimed regardless of whether any criminal investigation or trial is pending, one need only consider the case of a civil action against defendants who have committed a serious undiscovered crime. In such a case, truthful testimony in the civil case would necessarily amount not only to a disclosure of the crime, but also to a confession of guilt. It is this situation, not the case at bar, which presents the defendants with the most difficult choice.

In such a circumstance, however, defendants could not avoid this choice. They would be forced to (a) perjure themselves; (b) testify truthfully and thereby reveal their crime as well as confess their guilt; or (c) claim their Fifth Amendment privilege and suffer any resulting adverse inferences. No reason occurs to this court why the equities or the legal rights of such defendants should be preferred even after their crime has been discovered and they have been identified as targets.

On the contrary, it would appear that the closer law enforcement agencies have come to being able to prove a defendant's guilt beyond a reasonable doubt without the benefit of his testimony, the less compelling a

---

**3.** While there may well be theoretical circumstances in which testimony which tends to incriminate would be helpful in a civil case, the court has not seen such an instance in practice and would consider it to be particularly unlikely where the criminal and civil cases arise from the same alleged conduct.

defendant's claim that he should receive a stay or other advantage in a civil case by reason of his desire to retain his Fifth Amendment privilege in a criminal case.

### 3. Prejudice to Plaintiff

 The interests of a plaintiff are also an important consideration in deciding whether to stay or continue a civil action. Indeed, there are many reasons why it may be particularly undesirable to stay civil cases against defendants accused criminally of sophisticated business frauds. It is hard to see why the indirect societal interest in bringing to justice the perpetrators of crimes should ever take precedence over the direct interest of the victims of crimes to obtain redress for their losses.

Fraud victims in particular are at great risk if they do not promptly and diligently act to protect themselves as soon as they have reason to believe they have been defrauded. It is to be expected that as soon as the defrauder learns that he is under suspicion, he will undertake to abscond with, spend or hide the fraud proceeds. Fraud victims do not have rights of attachment or other similar remedies by which to tie up assets pending the outcome of litigation. On the contrary, they can do virtually nothing to stem the outflow of fraudulently obtained assets until they have a judgement in hand.

This case presents a very common, but seldom recognized, example of the kind of outflow of assets which may occur if plaintiff's action is stayed while criminal proceedings are pending. At least one of the defendants here has made clear that he would be willing to transfer substantially all of his assets to plaintiff in order to settle this lawsuit, but that he has felt unable to do so, because that would leave him without funds to pay to the criminal lawyer whom he has engaged to defend him in the criminal case. The irony of this situation, of course, is that if the defendant is found guilty in the criminal case, the very funds which he fraudulently obtained from the plaintiff here will have been used up before any restitution order can be entered by the court.[4]

Moreover, IBM believes that many of the assets which the defendants purchased with the profits from their fraud have been foreclosed upon by the creditors or sold. IBM filed this action in August, 1992, primarily to recover assets from the defendants. Since then, defendant Brown has been sentenced to five years in prison and defendants Matthew Cho and Henry Cho have disappeared and are now fugitives. Obviously, the passage of time increases the risk of further depletion of any assets remaining to satisfy a possible judgment. Indeed, the ADP defendants' civil attorneys recently withdrew from this case because, as they represented to the court, they had not been paid by their clients for over a year. Thus, a stay of this action would delay and likely hinder any possible recovery that IBM may obtain.

The defrauded victim, of course, has no assurance that the criminal investigation will result in prosecution. Sophisticated business frauds ordinarily are designed to look as much as possible like ordinary commercial transactions. The intent element, therefore, is often difficult to prove, even in cases in which the victim's right to recover its loss on contract, unjust enrichment or other legal theories is clear. To require the victim to forego the pursuit of its own rights for an indeterminate period, while awaiting the doubtful outcome of an investigation done in pursuit of broader interests, seems unnecessary and unfair.

Defendants assert that once an indictment has been brought and a trial date estab-

---

**4.** It must be noted that defendant's position, while sympathetic, is not one which involves the right to counsel. If the defendant did deliver substantially all of his assets to the plaintiff in satisfaction of the claim here, he would be entitled to be defended as an indigent, at public expense. His desire to have his own *choice* of counsel in the criminal case accounts for his unwillingness to settle his civil case. Whether the court should help him preserve his assets so that they can be spent on counsel of his choice in the criminal case, in the last analysis would seem to depend on whether the assets in fact are his, or whether in fact they have been taken unlawfully from the plaintiff. In this court's view, although it is vital that this defendant, like all criminal defendants, be accorded the presumption of innocence by the jury at his criminal trial, the court is not required to ignore the overwhelming likelihood that persons indicted will be found guilty, or the overwhelming evidence already before it which establishes that the defendant has converted assets from IBM.

lished, the equation of justice should be deemed to have changed. Regrettably, however, the more complex the fraud, and the larger the number of parties involved, the less likely the case is to proceed to trial on a given trial date. Often, defendants plead guilty at the last moment before trial, and often they waive their Fifth Amendment privilege by testifying at trial. In such cases, it is hard to see in hindsight how the interests of justice have been served by permitting the defendant to delay his civil case.

The prospect that the criminal trial will eliminate the obstacle to obtaining the defendant's testimony at the civil trial is likely to be illusory. In all cases in which the defendant is found guilty the privilege will remain until after the appeal. Most importantly, however, the thought, that the defendant's right not to incriminate himself by testifying in a civil case should be directly proportional to the government's ability to prove a case against him without his testimony is illogical and unsound.

### 4. *The Interests of Judicial Administration*

Another factor weighing against a stay is the court's interest in managing its own calendar. *Molinaro,* 889 F.2d at 903. In the Pre–Trial Conference Order lodged with this court, the parties estimated a ten-to-twelve day jury trial. This court's calendar is burdened with its own criminal proceedings that have priority over IBM's civil action. A stay would disrupt the court's calendar by indefinitely postponing trial as the defendants' criminal proceedings wend their way through the state criminal justice system.

Not only would a stay prevent IBM from obtaining a speedy civil remedy, but it would waste scarce judicial resources. As another court observed, "a policy of issuing stays solely because a litigant is defending simultaneous multiple suits would threaten to become a constant source of delay and an interference with judicial administration." *Arden Way Associates v. Boesky,* 660 F.Supp. 1494, 1497 (S.D.N.Y.1987) (citing *Paine, Webber, Jackson & Curtis Inc. v. Andrus,* 486 F.Supp. 1118, 1119 (S.D.N.Y.1980)).

Finally, a stay of this action would render much of the completed trial preparation use-less. At this point, the parties essentially have completed all pre-trial work under Local Rule 9. Needless to say, delay of this trial would require much of this work to be redone later, at undue expense and burden to all concerned.

### III.

### CONCLUSION

Defendants' motion and the record before the court provide no basis for staying or continuing this action pending the outcome of defendants' criminal proceedings. The interests of the court, the potential prejudice to the plaintiff and public policy compel prompt prosecution of this action.

IT IS SO ORDERED.