FEDERAL TRADE COMMISSION,
Plaintiffs

v.

J.K. PUBLICATIONS, INC.,
et al., Defendants.

No. CV 99–0044ABC(AJWX).

United States District Court,
C.D. California.

April 7, 2000.

David Spiegel, Douglas Wolfe, Tracey Brown, Federal Trade Commission, Washington, D.C., Jennifer Larabee, Federal Trade Commission, Los Angeles, CA, for Plaintiff/Petitioner/Appellant.

Scott Furstman, Santa Monica, CA, Brian Clark, Jones & Vargas, Las Vegas, NV, Joel Levine, Encino, CA, for Defendant/Respondent/Appellee.

ORDER RE: (1) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND (2) DEFENDANT MAURICE O'BANNON'S MOTION FOR SUMMARY JUDGMENT

COLLINS, District Judge.

Plaintiff Federal Trade Commission's ("FTC") Motion for Summary Judgment (the "Motion") and Defendant Maurice O'Bannon's ("O'Bannon") Motion for Summary Judgment (the "O'Bannon Motion") came on regularly for hearing before this Court on April 3, 2000. After considering the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that: (1) the FTC's Motion is GRANTED, in part, on the issue of liability as to defendants J.K. Publications, Inc. ("JKP"), Herbal Care, Inc. ("Herbal Care"), MJD Services Corp. ("MJD"), Kenneth H. Taves ("Ken Taves"), and Teresa Callei Taves ("Teresa Taves"); (2) the FTC's Motion is DENIED, in part, on the issue of damages with respect to JKP, Herbal Care, MJD, Ken Taves and Teresa Taves; (3) the FTC's Motion against O'Bannon is DENIED; and (4) the O'Bannon Motion is GRANTED.

## I. Procedural Background

On January 6, 1999, the FTC filed a complaint for a permanent injunction and other equitable relief, and an *ex parte* motion for a temporary restraining order ("TRO") without prior notice to the defendants. The complaint alleges that the defendants had committed unfair and deceptive business practices in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a). The Court issued a TRO on the same day against the following defendants: JKP; Ken Taves and Teresa Taves, individually and as officers of JKP, also dba Netfill, netfill.com, N–Bill, Webtel and Online Billing; Net Options, Inc.; Gary Neal Mittman, individually and as an officer of Net Options, Inc.; and MJD. The TRO froze the defendants' assets and required, *inter alia*, that the defendants be temporarily enjoined from conducting certain business practices and the defendants disclose all assets held by them, for their benefit or under their direct or indirect control. The Court also appointed a receiver, Robb Evans and Robb Evans & Associates ("Receiver") to administer the defendants' businesses.

On January 7, 1999, the FTC served the complaint and TRO on the defendants. On January 20, 1999, the FTC filed an amended complaint naming the following additional defendants: Herbal Care; TAL Services, Inc. ("TAL"); Adult Banc, Inc. ("Adult Banc"); Discreet Bill, Inc. ("Discreet Bill"); Dennis Rappaport ("Rappaport"), individually and as an officer of TAL, Adult Banc, Inc. and Discreet Bill; O'Bannon, individually and as an officer of TAL and MJD. The amended complaint also added an allegation that the defendants engaged in a common enterprise while violating the FTC Act.

On March 5, 1999, the Court issued a preliminary injunction order against Gary Mittman and Adult Banc. On March 15, 1999, the Court issued a preliminary injunction order against JKP, MJD, Ken Taves and Teresa Taves. On May 4, 1999, the Court issued Findings of Fact and Conclusions of Law holding Ken Taves in contempt of the Court's TRO by failing to disclose the property located at 6837 Zumi-

rez Drive in Malibu, California ("Zumirez Property") and causing the transfer of the Zumirez Property to an entity called Trans Global on or about February 12, 1999. The Court ordered Ken Taves to pay $2,050,000, the estimated sale price of the property, into the receivership estate within seven days to purge himself of the contempt. The Court also ordered that Ken Taves shall be imprisoned until he complies with the order if he fails to pay the $2,050,000 within the prescribed time. To this date, Ken Taves has not purged himself of this contempt. He remains imprisoned at the Metropolitan Detention Center ("MDC") in Los Angeles.

On May 5, 1999, the Court issued a separate Findings of Fact and Conclusions of Law holding Ken and Teresa Taves in contempt of the Court's preliminary injunction order by, *inter alia*, failing to disclose an account at Euro Bank in the Cayman Islands with an estimated $6.2 million in assets and failing to prevent dissipation of the Euro Bank account. Ken and Teresa Taves were ordered to take all steps possible and necessary to ensure the repatriation of the $6.2 million or else face imprisonment. Although the couple have signed various documents to repatriate the monies, the Receiver has not recovered the monies to this date.[1]

On June 10, 1999, the Court entered a stipulated final judgment and preliminary injunction order against Gary Mittman and Adult Banc. On July 29, 1999, the Clerk entered a default against Discreet Bill and TAL. On August 11, 1999, the Clerk entered a default against Rappaport. On February 8, 2000, the Court entered default judgment and permanent injunction against Rappaport.

On November 29, 1999, the FTC filed the motion for summary judgment against JKP, MJD, Herbal Care, Ken Taves, Teresa Taves and O'Bannon. On December 6, 1999, O'Bannon filed an opposition to the Motion. On December 13, 1999, JKP, Herbal Care and Ken Taves filed their opposition to the Motion. On the same day, Teresa Taves filed her opposition to the Motion. On December 20, 1999, the FTC filed its reply.[2]

On December 20, 1999, O'Bannon filed his own motion for summary judgment.[3] On December 22, 1999, the FTC filed its opposition to the O'Bannon Motion. On February 24, 2000, O'Bannon filed a reply.[4]

## II. Factual Background [5]

motions back on calendar and set them for hearing on April 3, 2000.

---

1. On May 24, 1999, the Court ordered that Teresa Taves' contempt shall be considered purged in the event that she files a declaration under penalty of perjury detailing her efforts to locate documents related to the Euro Bank account and she turns over any such documents immediately upon discovery. On May 24, 1999, Teresa Taves filed a declaration stating that she had found no Euro Bank records in her home.

2. MJD is no longer represented by counsel and did not file an opposition.

3. The motion cutoff date—the last day for a motion to be heard—was December 20, 1999. Although the O'Bannon Motion was untimely, the Court will consider the motion. The FTC has had a full opportunity to brief its opposition to this motion.

4. On January 21, 2000, due to the illness of the presiding judge, the Court took the Motion and the O'Bannon Motion off calendar. On March 23, 2000, the Court placed the

5. These undisputed facts are derived largely from the FTC's statement of uncontroverted facts ("FTC's Statement") and the Court's review of all admissible evidence submitted by the FTC. On the issue of liability, JKP, Herbal Care and Ken Taves did not submit any evidence to oppose the Motion. Rather, in their joint statement of genuine issues, these defendants responded to the FTC's "facts" in one of three ways: (1) "Defendants ... do not dispute this fact"; (2) "Defendant Kenneth Taves cannot respond to this alleged fact at this time based on his right against self-incrimination" and "[t]he corporate defendants, [JKP and Herbal Care], are also unable to respond at present because Mr. Taves is the witness with knowledge ..."; or (3) "Defendants ... lack the information to know whether this is a disputed fact." In short, on the issue of liability, JKP, Herbal Care and Ken Taves have identified no facts and submitted no evidence which controvert the facts

## Defendants[6]

**JKP, MJD and TAL.** JKP and MJD were Nevada corporations engaged in operating 14 adult-content Internet web sites. JKP was incorporated on September 14, 1995. From at least June 1997 through October 1998, JKP conducted business under the names Netfill and N–Bill. MJD was incorporated on May 5, 1998. At some point in 1998, MJD supposedly purchased JKP's book of business. From May 1998 through December 1998, MJD conducted business under the name Webtel. In 1998, JKP and/or MJD also conducted business under the names Online Billing and Assist Online. On October 16, 1998, TAL was incorporated in Nevada. A month or two later, MJD transferred its book of business to TAL. JKP, MJD and TAL operated out of the same Malibu,

California offices.[7] The same employees worked for these companies.

**Herbal Care & Discreet Bill.** Herbal Care was a California corporation co-founded in the mid–1980s by Ken and Teresa Taves. During times relevant to this action, Herbal Care sold no products. Instead, in 1997 and 1998, its sole "business" consisted of paying the employees of JKP, purportedly after JKP provided the funds to Herbal Care. Discreet Bill, a Nevada corporation, took over Herbal Care's role of paying JKP employees in the fall of 1998.

**Ken and Teresa Taves.** Ken Taves and Teresa Taves, husband and wife, are the owners, officers and directors of JKP and Herbal Care. In 1998 alone, Ken and Theresa Taves were each paid a salary of at least $1.7 million for their services to JKP.[8] Ken Taves was actively involved in

included in FTC's Statement. With respect to certain "facts" relevant to the calculation of damages, these defendants did raise a challenge with the support of an expert declaration. Therefore, the Court finds that all facts included in the FTC's Statement to prove the liability of JKP, Herbal Care, Ken Taves, and MJD (because it did not oppose the Motion), to the extent supported by the evidence, exist without controversy. *See* Local Rule 7.14.4 ("In determining any motion for summary judgment, the Court will assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the "Statement of Genuine Issues" *and* (b) controverted by declaration or other written evidence filed in opposition to the motion") (emphasis added).

Teresa Taves filed an improper and unhelpful statement of genuine issues. She should have identified each fact from the FTC's Statement that is purportedly in dispute and, in a side by side comparison, pointed to facts and evidence that show a genuine issue exists. Instead, she merely (1) incorporates by reference JKP, Herbal Care and Ken Taves' statement of genuine issues and (2) lists purported genuine issues (*e.g.*, "[w]hether Defendant Teresa Taves had actual knowledge of any illegal activity by any defendant . . .") without identifying supporting facts. She has submitted a copy of a sworn declaration filed in January 1999 and a copy of a portion of her deposition testimony as exhibits in support of her opposition. These exhibits concern her

alleged lack of knowledge concerning the defendant companies' activities. But the facts included in FTC's Statement to prove the liability of Teresa Taves remain essentially undisputed. Teresa Taves has consistently denied having knowledge of material facts. The issue that the Court must determine boils down to whether, despite her denial of knowledge, the FTC has sufficient evidence to show Teresa Taves should be held liable as a matter of law.

O'Bannon's statement of genuine issues (in opposition to the Motion) and statement of uncontroverted facts (in support of the O'Bannon Motion) are similarly deficient in form and substance and, therefore, unhelpful to the Court. As in Teresa Taves' case, the issue boils down to whether the FTC has sufficient evidence to show that O'Bannon should be held liable as a matter of law.

6. Unless necessary for background information, the Court only discusses the defendants that remain in this action.

7. JKP operated out of an office located at 22917 Pacific Coast Highway in Malibu, California, from at least April 1997 until January 1998. Thereafter, JKP operated out of offices located at 22761 Pacific Coast Highway in Malibu. The 22761 Pacific Coast Highway offices were also used by MJD, TAL, and Discreet Bill at all relevant times.

8. Even their son, who was 15 or 16 in 1998, was paid a salary of over $48,000 in 1998 for

the daily operations of his companies. He also held himself out to employees and third parties as the final decision maker for all key matters.

With respect to MJD, Ken Taves is not identified as an officer or director on corporate documents. Also, Ken Taves had informed a third party that he was a mere "consultant" for the company. However, the evidence shows that he had ownership in and/or control over MJD.[9] According to his employees, Ken Taves held himself out as a final decision maker for matters involving MJD. Additionally, Ken Taves was the only person responsible for making payments to Automated Transaction Services, Inc. ("ATS"), the company which processed the defendant companies' credit and debit card transactions,[10] on behalf of both JKP and MJD. As discussed below,

Ken Taves was also the only person who submitted JKP and MJD's e-mail charge requests to ATS for processing. Moreover, according to Randall Ball,[11] all of the "entities"—Netfill, N–Bill, Online Billing, Webtel, TAL and MJD—were part and parcel of the same company over which Ken Taves had "control." (Ball Depo. at 12–14.)[12] "The names [merely] changed periodically." (*Id.*)[13] Further, in December 1998, when one of MJD's merchant accounts was terminated, Ken Taves contacted the agent who assisted MJD in obtaining the account to inquire about the reason for the termination. At the very least, the record shows that Ken Taves was actively involved in MJD and the two companies—JKP and MJD—and their principals were cohorts in the same scheme.[14]

either "provid[ing] marketing concepts for marketing" or "clean[ing] up" the offices. (K. Taves Depo. at 102 & Depo. Ex. 5; T. Taves Depo. at 731–32.)

9. The FTC attempts to introduce certain "evidence" against Ken Taves purportedly elicited from Martin J. Dugan in regard to MJD, its formation and its operation. *See* Motion at 20, note 92. During his deposition, however, Martin Dugan invoked the Fifth Amendment privilege against self-incrimination in response to all substantive questions asked by counsel. The FTC argues that the Court can draw adverse inferences from Dugan's assertion of the Fifth Amendment against Ken Taves and the other defendants. *Id.* After reviewing the cases cited by the FTC, which the Court finds distinguishable, the Court declines to draw such adverse inference. *See id.* (citing *LiButti v. United States,* 968 F.Supp. 71 (N.D.N.Y.1997) (case brought by the named-owner of a valuable racehorse against which the IRS had issued a tax levy due to lack of assets in the name of named-owner's father, the delinquent taxpayer; on issue of whether the daughter or the father really owned the horse, the district court drew adverse inferences from non-party father's invocation of the Fifth Amendment privilege at trial after the court of appeals determined that adverse inference was permissible under the circumstances of this case), *aff'd, LiButti v. U.S.,* 178 F.3d 114 (2d Cir.1999)); and *RAD Servs., Inc. v. Aetna Casualty & Surety Co.,* 808 F.2d 271 (3rd Cir.1986) (plaintiff company sued its insurer to recover costs incurred in disposing of hazardous waste materials;

court allowed jury to draw adverse inferences against the company from the silences of two non-party witnesses—one a former officer and director of the company and the other a former employee—who were involved in the alleged plan to unlawfully dump the hazardous waste materials). For this ruling, the Court does not rely on any fact that is supported solely by Martin Dugan's silence during his deposition.

10. In June 1999, ATS was purchased by Quick Pages, Inc., a Minnesota company.

11. Ms. Ball was Ken Taves' office administrative assistant from January 1997 to January 1999.

12. Ms. Ball also testified that the same employees worked out of the same suite of offices in Malibu and there was no distinction between work done for JKP/Netfill as opposed to work done for MJD or TAL. (*Id.* at 19–20.)

13. When asked why the company's name changed, *e.g.,* from JKP/Netfill to MJD, Ken Taves and Rappaport told Ms. Ball that the company was growing so different merchant accounts had to be set up with different names because banks could only process a certain volume/amount per merchant account. (*Id.* at 21–22.)

14. Ken Taves attempted to but could not quite explain the business relationship between MJD and JKP. He claims that pursuant to a contract between MJD and JKP, MJD paid

Teresa Taves has been married to Ken Taves since 1982. (T. Taves Depo. at 800.) [15] Before her marriage, in the 1970s, she worked for five years at Security Pacific Bank. (*Id.* at 683.) She started as a bank teller, advanced to the position of chief teller and later transferred to the bank's loan department. (*Id.*) After leaving the bank, she worked for six months for a real estate company and two years in sales for a garment company. (*Id.* at 684.) Around 1985, a few years into her marriage, Teresa Taves worked for Herbal Care, the company she and her husband co-founded. She handled customer service and the shipping of products for approximately three years. (*Id.* at 684–85.) Then, the company "kind of dissolved" because "it just wasn't a strong company." (*Id.* at 686–87.) During the next five years, with the exception of time-off for maternity leave, Teresa Taves worked part-time at another company formed by Ken Taves, handling shipping and answering calls. (*Id.* at 687.) The company sold or distributed computer toner supplies. (*Id.*) Around 1994 or 1995, before JKP was formed, this computer toner supplies company dissolved. (*Id.* at 688.)

Teresa Taves assisted her husband with JKP's operations. She visited the Malibu offices occasionally, ran errands for the companies, entertained customers and held parties for the employees. (*Id.* at 690.) The record does not show that she was involved in the daily operations of JKP's business. However, as an officer of JKP, she signed checks, letters and corporate documents on behalf of JKP. The documents include federal corporate tax returns, bank account applications and signature cards, and statements concerning JKP/Netfill's business history. During her deposition, Teresa Taves repeatedly testified that she did not read the documents that she signed or did not recall reading the documents, even when those documents contain her initials next to statements such as "Merchant Initial When Read." (*See, e.g., id.* at 748 ["I was just told to sign them and I signed them. I didn't really read the fine print"], 750 ["I don't remember reading it"], 752 ["I didn't read these documents"], 763 ["I didn't read [them], I just signed them"].) [16] She also denied having any knowledge of fraud by any of the defendants. (*See, e.g., id.* at 752–53, 765–66, 769–71, 789–F–789–I.) [17]

But the evidence shows that she had a general understanding of JKP's business operations. For example, she knew that JKP's business operated adult-content web sites. (*Id.* at 711, 789–P.) She knew that merchant bank accounts were necessary

JKP for the credits and chargebacks against JKP's merchant accounts (presumably after MJD took over JKP's book of business). (K. Taves Depo. at 64–67.) But the contract may or may not have been written (*id.* at 64, 67) and no service was actually provided by MJD to JKP (*id.* at 66).

15. The Court notes that some of the material facts concerning Teresa Taves (and other defendants) discussed herein are not included in the FTC's Statement. However, these facts are all supported by the deposition transcripts, declarations or exhibits submitted by the FTC in support of the Motion. Therefore, the Court may consider the facts at this time. *See* Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact"). For the parties' convenience, all facts not listed in the FTC's Statement but referenced herein shall be accompanied by a citation to the record.

16. Included among the documents that she signed on behalf of JKP/Netfill was a single page "Business to Business Affidavit" whereby she made certain representations and warranties to a bank, *e.g.,* JKP/Netfill will not process a credit card transaction for any sale in which the merchandise or service has not been delivered. (*Id.* at 871.) When asked at her deposition whether each representation or warranty on the affidavit was true, Teresa Taves' answer was generally "I don't know," "I have no idea," or "I don't know if it was true or not." (*Id.* at 779–781.)

17. During her deposition, she also refused to answer many questions on the ground that her answer might divulge confidential communications between her husband and her.

for JKP to charge and process credit card payments.[18] (*Id.* at 736–37.) She was aware that ATS processed all of JKP's credit card transactions. (*Id.* at 782–83.) She also knew that customer service employees at the Malibu offices handled calls from disgruntled consumers seeking credits or "chargebacks" from the companies. (*Id.* at 730, 771.) [19] She talked to employees, observed their activities and overheard telephone conversations during her visits to the Malibu offices. (*Id.* at 789–S–791.)

In addition, Teresa Taves played a key role—she was instrumental in JKP's ability to obtain merchant bank accounts. As discussed below, Teresa Taves ultimately acted on behalf of JKP in its efforts to obtain merchant accounts after Ken Taves' application was rejected because of his bad credit record. Teresa Taves recalls submitting merchant bank account applications on behalf of JKP. (*Id.* at 737.) On at least one occasion, she went to the premises of Charter Pacific Bank ("Charter Pacific"), met with bank personnel, including Richard Cornejo, the Executive Vice President/Bank Card Manager, and signed documents on site. (*Id.* at 746–749, 758–59.) [20] On another occasion, Teresa Taves, unac-

companied by her husband, met with an agent to sign documents related to a merchant bank application with Heartland Card Services (or Heartland Bank) ("Heartland"). (*Id.* at 773–76 ["I know my husband wasn't there"].)

Finally, Teresa Taves was aware that JKP (and/or the Taveses' other related businesses) made an extraordinary amount of money in 1997 and 1998. As mentioned earlier, Teresa Taves and her husband were *each* paid around $1.7 million in 1998 by Herbal Care for their work and involvement with JKP. She knew that her 15 or 16 year old son was paid a salary, which amounted to approximately $48,000, even though he only "spen[t] a little time" in the offices and she did not know what his duties were other than "cleaning up." (*Id.* at 731–33.) [21] She also testified that the family earned close to $4 million from JKP's operations in 1997. (*Id.* at 804.) Before 1997, she and her husband had never made so much money from any of their business endeavors. (*Id.*) [22]

***Rappaport.*** Dennis Rappaport has been a friend of the Taveses for approximately twenty years. Discreet Bill was Rappaport's company. In 1998, he worked full-time at the Malibu offices acting as Ken

---

18. A merchant account is a bank account that is used to accept credit cards as payment for the sale of products or services.

19. When a card holder complains of unauthorized charges, the card holder can receive a reimbursement by chargeback or credit. If the issuing bank accepts the complaint from a customer who disputes a charge on his or her account statement, it will reverse or charge back the transaction through the credit or debit card interchange. The "chargeback" causes a debit to be placed on the merchant's account at its bank and a credit on the customer's account at the issuing bank. A fee against the merchant account is ordinarily assessed for each chargeback. Alternatively, a credit can be given to the card holder by the merchant directly (whereby the merchant agrees to reimburse the card issuer), or it can be given by the card issuer (where the issuing bank absorbs the cost of the unauthorized charge).

20. Teresa Taves testified that she did not specifically recall the conversations that took place at this meeting. (*Id.*)

21. She testified that she did not know the exact amount of compensation. When presented with records showing that Herbal Care paid her son approximately $48,000 in 1998, she did not express any surprise. (*Id.* at 733–35.)

22. Some additional facts are worthy of mention. Ken Taves faced a felony check alteration charge in 1997. (*See* 12/20/99 Speigel Decl., Attachment "A" [T. Taves Depo. at 4–6].) Teresa Taves claims that she did not learn about this charge until after the commencement of this action. (*Id.*) However, Teresa Taves has known since at least 1995 that her husband had been in trouble with the law in the past: (1) he faced a murder charge in 1988 involving a victim who was a financial or business associate of Ken Taves; and (2) prior to their marriage, he had some unspecified criminal problems. (*Id.* at 12–16.)

Taves' office manager. In addition, Rappaport held himself out to employees and third parties as a contact for both MJD and TAL.

*O'Bannon.* Maurice O'Bannon had an informal agreement with Nevada Corporate Headquarters, Inc. ("Nevada Corp."), an incorporator, to act as a nominee for their client-corporations and sign whatever documents Nevada Corp. wanted him to sign. He visited the office once or twice a week to sign documents. (O'Bannon Depo. at 283.) O'Bannon claims that he has never received a salary from Nevada Corp. (*Id.* at 282.) He has received "a few little benefits" in exchange of his work, such as "a hand-me down ... used computer or something on that order" and the use of a Cadillac car. (*Id.* at 282–83.)

Corporate documents show that O'Bannon was an officer and director of MJD, Discreet Bill and TAL in 1998.[23] A merchant bank agreement between Charter Pacific and TAL indicates that O'Bannon signed the agreement on behalf of TAL in December 1998, even though the corporate documents show that he had tendered his resignation as an officer and director of TAL on October 29, 1998. (*See id.* at 305 [Resolution of the Board of Directors of TAL]; 311–322 [merchant agreement].) However, O'Bannon testified that he was not aware that he had held those roles (prior to his telephone deposition), he was not familiar with those companies, and he has never received any money from those companies. (*Id.* at 285–286, 289, 291–92, 299–300.) He either does not recall signing the documents or claims that the signatures on the documents appear to be impressions from his signature stamp (and placed on the documents by someone else). (*Id.*)[24] O'Bannon acknowledged that he, on behalf of Discreet Bill, signed the fictitious business name certificates that indicate Discreet Bill (and not JKP or MJD) did business as N–Bill, Webtel, Online Billing and Assist Online. (*Id.* at 293–98; *see id.* at 307–10.)[25] However, he has no specific recollection of signing these statements. Apparently, it was his practice to go to Nevada Corp.'s offices, sit at a table and sign whatever documents the company gave him to sign without actually reviewing the documents. (*See id.* at 293 ["I signed things that they give me to sign, and I don't really know too much about everything I sign"], 298 ["I just would, you know, sit at a table and sign them"], 301–02 ["I possibly would [sign a lengthy document without reading it first] because I don't look at it that carefully when I sign those papers"].) He is "not sure" whether anyone at Nevada Corp. had authority to

**23.** According to the corporate documents: O'Bannon served as an officer for (1) Discreet Bill from March 17, 1998 to April 25, 1999 (O'Bannon Depo. at 306; O'Bannon Motion, Ex. C); (2) MJD from May 7, 1998 to June 3, 1998 (O'Bannon Depo. at 304–304–A); and (3) TAL from unknown date to October 29, 1998 (*id.* at 305).

**24.** With respect to the December 1998 merchant bank agreement between TAL and Charter Pacific, O'Bannon testified that he "sees [his] signature stamp" on the last page. (*Id.* at 299; *see id.* at 322.) The signature page of the agreement does not contain a date line next to his name. (*See id.* at 322.) The handwritten "12–8–98" below O'Bannon's title and above the "Authorized Bank Signature" could have been written by O'Bannon or the person who signed on behalf of the bank. (A separate "12–22–98" notation on the lower left hand corner is accompanied by initials of someone from the bank.) During O'Bannon's deposition, the FTC did not ask O'Bannon whether the "12–8–98" was written by him. The Court does not know whether the FTC deposed the person who signed this agreement on behalf of the bank to determine whether O'Bannon signed the agreement at the bank and/or whether the bank personnel wrote the "12–8–98". (O'Bannon testified that he was "pretty sure" that he was in Las Vegas on or about December 8, 1998 (*id.* at 302).)

**25.** The notarized documents show that O'Bannon signed the certificates concerning Discreet Bill's use of (1) "N BILL" on September 15, 1998, (2) "ONLINE BILLING" on September 15, 1998, (3) "WEBTEL" on December 10, 1998, and (4) "ASSIST ONLINE" on December 10, 1998. (*See id.* at 307–10.)

sign his signature in 1998. (*Id.* at 301.)[26]

O'Bannon claims that he does not know any person named Ken Taves, Teresa Taves, or Lee Sacks, former counsel for Ken Taves and his companies. (*Id.* at 302.) He also does not know anyone associated with MJD or Discreet Bill and does not have any knowledge about these companies' businesses. (*Id.* at 303.)

### JKP dba Netfill's High Volume "Business" and Trouble with the Banks

To become a member and utilize the adult-content Internet web sites, customers must submit a credit or debit card number. Defendants' web sites charged a $19.95 monthly fee. ATS processed credit and debit card transactions for JKP, MJD and TAL.[27] ATS was responsible for submitting these defendants' charge requests to the authorizing networks and collecting the payments.

In late 1996 or early 1997, Ken Taves applied for a merchant account with Charter Pacific. Charter Pacific turned down his application because he had a terrible credit record. Unlike her husband, Teresa Taves was creditworthy. Therefore, on or about June 2, 1997, Teresa Taves, acting as President of JKP dba Netfill, signed a merchant account application with Charter Pacific. On or about June 4, 1997, Ken Taves, acting on behalf of JKP, forwarded to Charter Pacific a copy of the notarized fictitious business name filing that con-

firms JKP can do business as Netfill. (K. Taves Depo. at 94 & Depo. Ex. 4.) JKP/Netfill's application was approved on or about June 5, 1997. Charter Pacific's files list Ken and Theresa Taves as contacts for the JKP/Netfill merchant account.

In November 1997, on a form filled out by Ken Taves, Teresa Taves signed (on behalf of JKP/Netfill) an agreement to purchase access to various historical credit card number databases from Charter Pacific. JKP/Netfill ordered, among others, "Positive Database File # 2," which contained the date of sale, card number and dollar amount of every Visa and Mastercard transaction processed through any merchant of Charter Pacific during the previous 11 months for which there had been no chargebacks or credits issued ("Charter Pacific Positive Database"). This database contained no information about the card holder. JKP/Netfill could download the Charter Pacific databases electronically.

Coinciding with JKP/Netfill's access to the Charter Pacific historical databases, JKP/Netfill began transmitting thousands of credit card charge requests to ATS by e-mail.[28] In late 1997 or early 1998, Ken Taves, on behalf of JKP, began submitting customer charge information to ATS by e-mails with attached text files. The text files, transmitted once or twice a month, contained up to thousands of credit and debit card numbers.[29] At times these files

---

**26.** The Court does not know whether the FTC deposed Nevada Corp. or its employees to determine whether someone had authority to sign O'Bannon's name and/or whether someone else used O'Bannon's signature stamp to sign documents.

**27.** ATS processed charges for (1) JKP from 1995 to 1998; (2) MJD in 1998; and (3) TAL from late 1998 to January 1999. The only written transaction agreement that exists between ATS and these companies is a 1995 contract signed by Ken Taves on behalf of Netfill.

**28.** Prior to that time, subscriptions to the adult web sites were processed solely by

HTML post. In other words, customers would input the necessary data, *e.g.*, their credit or debit card information, on a form generated by their Internet browsers, hit the submit button, and transmit the data directly to ATS's server for authorization. According to Ms. Ball, this was the only method by which the defendant companies processed subscriptions and obtained cardholders' credit or debit card numbers. (Ball Depo. at 31–32.)

**29.** According to David Goldfarb, one of the owners of ATS, Ken Taves informed him that one reason for the e-mail transmissions was that JKP, and later MJD, were submitting

omitted customer names, customer e-mail addresses and card expiration dates. From those e-mail transmissions, it was impossible for ATS to determine whether a cardholder had visited the defendants' web sites. Nevertheless, ATS accepted the numbers and processed the charge requests.[30] Ken Taves transmitted credit card charge requests by e-mail to ATS on behalf of JKP, and subsequently on behalf of MJD, through the end of 1998.[31]

Also near the time that Ken Taves began transmitting large volumes of charge requests to ATS by e-mail, the JKP/Netfill merchant account at Charter Pacific came to the attention of Visa USA's chargeback monitoring program because its charge-

back rate exceeded the maximum monthly norm permitted for merchants.[32] At the time, the chargeback rate which triggered Visa USA monitoring was an overall rate of 2.50% or more per month or a consumer dispute chargeback rate of 1% or more.[33] By January 1998, the JKP/Netfill account had a 5.54% overall chargeback rate (2,556 chargebacks out of 46,127 transactions) and by February 1998, the JKP/Netfill account had a 6.11% overall chargeback rate (2,656 chargebacks out of 43,480 transactions). On March 30, 1998, Visa USA notified Ken Taves and Charter Pacific that the Netfill account had an excessive number of chargebacks four months in a row—November 1997, December 1997, January 1998 and February 1998.[34] (See

charges on behalf of other Internet merchants—merchants who lost their merchant accounts—through JKP and MJD's merchant accounts for a fee. The banks with which JKP and MJD held merchant accounts were not aware that JKP and/or MJD were submitting charge transactions for the web sites of third parties.

30. In 1998 alone, ATS was paid approximately $2.35 million in fees—$1.25 million in checks and $1.3 million in wire transfers—from Ken Taves and/or his companies for the services ATS provided to JKP and MJD. (Goldfarb Depo. at 503–05.) Interestingly, the checks were made payable to ATS and deposited in Bank of America, where ATS maintained a business banking account; however, the wire transfers were sent to an Euro Bank account (in the Cayman Islands) held in the individual names of David Goldfarb and Bill Parodi, the former co-owners of ATS. (*Id.* at 511–12.)

31. When asked if he knew whether ATS processed charge requests after JKP/Netfill e-mailed a list of credit card numbers and expiration dates, Richard Cornejo, the Executive Vice President/Bank Card Manager of Charter Pacific, replied: "You're kidding?" (Cornejo Depo. at 1513.) Cornejo then stated that "It better not have occurred" because "[i]t's totally illegal." (*Id.* at 1514.)

32. Through its Risk Management Division, Visa USA monitors chargebacks suffered by merchants who accept Visa cards. The chargeback rate is calculated with the numerator being the number of transactions charged back to the merchant's bank and the denominator being the total number of all transactions charged through the system by

the merchant. In the first three months of excessive chargebacks, Visa USA contacts the merchant bank and asks them to fix the problem(s) causing the excessive chargebacks. If a merchant has four months of excessive chargebacks in any five month period, Visa USA places the merchant on "active monitoring" status. Visa USA also begins to assess fees against the merchant bank, which in turn assesses fees against the merchant. The fees include a $5,000 administrative fee and $25 per chargeback. In addition, the merchant is required to develop and follow a chargeback reduction plan. Typically, among the approximately 3.5 to 4 million merchants in the Visa card system, only 3 to 5 merchants reach four consecutive months of excessive chargebacks.

33. A chargeback can also occur for a number of reasons that do not involve a consumer dispute, *e.g.*, a transaction for which an authorization was never given by the issuing bank. (Elliott Decl. ¶¶ 4–5.) A consumer dispute chargeback is a chargeback initiated by a consumer complaint and determined by Visa USA to involve a merchant practice that may adversely impact the consumer, *e.g.*, credits not posted or defective merchandise. (*See id.;* Cornejo Depo. at 1570 (Ex. 14 [Visa USA letter to Netfill] ).)

34. According to Visa USA's records, the Netfill account at Charter Pacific had the following chargeback rates for March through June 1998: March 1998: 5.20% (3,095 chargebacks out of 59,470 transactions), April 1998: 9.53% (3,693 chargebacks out of 38,739 transactions), May 1998: 23.75% (4,391 chargebacks out of 18,489 transactions), and June 1998: 63.9% (2,983 chargebacks out of 4,668 transactions).

Cornejo Depo. at 1570–71.) Therefore, JKP/Netfill was required to submit a chargeback reduction plan within 15 days. (*Id.*) In addition, Visa USA warned Netfill that failure to reduce the chargeback ratios may result in the revocation of Netfill's Visa card acceptance privileges. (*Id.*) On April 3, 1998, Charter Pacific notified Netfill that a total of $71,250 in fees would be assessed to Netfill's account for the February 1998 chargebacks. (*Id.* at 1572.)

JKP/Netfill never submitted the requisite chargeback reduction plan. Instead, presumably to avoid "active monitoring" by Visa USA, JKP decided to switch merchant banks. On March 19, 1998, less than two weeks before the arrival of the Visa USA warning letter concerning the Charter Pacific account, Teresa Taves, as President of JKP dba Netfill, signed an application for a merchant account with Heartland Bank (via Heartland Card Services) ("Heartland"). Heartland approved the account on or about April 17, 1998.[35] Instead of "Netfill," the billing descriptor for this account (as it would appear on the cardholder's statements) was "N–Bill." On May 22, 1998, Netfill informed Charter Pacific that it would cease processing payments with Charter Pacific. Teresa Taves signed the letter on behalf of Netfill. On May 31, 1998, Charter Pacific closed the Netfill account.

However, JKP/Netfill continued to pay for access (and had access) to the Charter Pacific Positive Database until at least December 31, 1998. The Charter Pacific Positive Database files that JKP/Netfill could have accessed from November 1997 through January 7, 1999 (the date the Receiver took over) contained at least 3,622,418 valid Visa/MasterCard credit card numbers. (*See* Card Alert Services ("CAS") Report at 2163, 2165; *see also* discussion, *infra*, at 1193–94 & note 54.)

The N–Bill account with Heartland was approved at an opportune time. JKP/Netfill was able to avoid submitting a chargeback reduction plan and continue processing its credit/debit card requests without interruption. But almost immediately, in July 1998, the N–Bill account was flagged by the Visa USA chargeback monitoring program because of excessive chargebacks. In August 1998, according to Heartland's records, cardholders charged back 21,431 transactions worth $427,129 that had been billed through the N–Bill account.[36] Heartland assessed $321,465 in fees against JKP for the August chargebacks. (Carr Depo. at 975–76, 1347–49.) On or about September 16, 1998, Mr. Carr (Heartland) informed either Ken Taves or Mr. Goldfarb (ATS) that chargebacks on the N–Bill account were "way out of line." (*Id.* at 923–24.) Indeed, for September 1998, Visa USA registered a 9.67% chargeback rate for the N–Bill account. Moreover, September 1998 was the third consecutive month that N–Bill's chargebacks

---

35. Heartland's JKP/Netfill underwriting file contains a list of adult web sites operated by JKP/Netfill. (*See* Carr Depo. at 960–61, 1150.) The web sites included the following: erosisland.com, pinkbeaver.com, muffpie.com, pornhq.com, asianhq.com, cinemaxxx.com, porntheatre.com, and pornreview.com. (*Id.* at 1150.) Gary Mittman, the owner of Adult Banc, testified that in late 1998, Ken Taves "basically handed" him 14 adult web sites that JKP had developed but stopped operating. Those 14 web sites include the eight referenced above and one called "pureskin.com," (Mittman Depo. at 54–55), which is subsequently identified as a site owned and operated by MJD.

Based on Ken Taves' representation, Robert Carr, Heartland's Chief Executive Officer, believed that JKP only processed charge/debit card transactions for subscriptions to web sites that it owned and operated. Heartland maintains no merchant account relationship with merchants who processed charge/debit card transactions on behalf of third parties who did not have their own merchant accounts.

36. Visa USA's records show that the N–Bill account had a 6.63% chargeback rate for August 1998 (13,414 chargebacks out of 202,389 transactions). Apparently, the Heartland and Visa USA records contain different figures because Visa USA only monitors Visa card charges, whereas Heartland's records reflect chargebacks for all credit cards processed through its merchant accounts.

exceeded Visa USA's guidelines.[37] Realizing that it would soon go on Visa USA's "active monitoring" list, JKP/Netfill decided to close the Heartland account.

On September 29, 1998, Netfill sent a letter to Heartland requesting the closure of the N–Bill account effective October 1, 1998. Teresa Taves, as President of Netfill, signed the letter to Heartland. On October 1, 1998, Heartland closed the N–Bill account.

### Transfer of JKP/Netfill's Business to MJD and the Opening of New Merchant Accounts

As mentioned earlier, MJD was incorporated on May 5, 1998. It shared the same employees and the same suite of offices in Malibu used by JKP/Netfill. In addition to Ken Taves, Rappaport held himself out as a contact for MJD. Sometime after its formation, Ken Taves advised ATS that JKP's customers would become MJD's customers because MJD bought JKP's book of business. The evidence indicates that the transfer of JKP's book of business to MJD, to the extent that it occurred, was part of the scheme to avoid the detection of fraud.[38]

In May 1998, around the time that JKP closed its Netfill account at Charter Pacific, MJD applied for a merchant account with Charter Pacific. The MJD account, underwritten for an account where the merchant only processed charges for its own web site(s), was approved in May or June 1998. Almost immediately, the MJD account had excessive Visa card chargebacks. Visa USA records show that MJD had the following chargeback rates from August through November 1998: 3.11% (August); 6.63% (September); 9.62% (October); and 5.86% (November). (Elliott Decl. at 2154.) Thus, by the end of November 1998, the MJD account had exceeded Visa USA's acceptable chargeback ratios for four months.

In October 1998, when its merchant account at Charter Pacific was entering its third month of excessive chargebacks, MJD opened a merchant account with Heartland using "Webtel" instead of MJD as the merchant descriptor.[39] On its application, MJD identified "www.pureskin.com" as its adult-content web site.[40] On December 3, 1998, following a four-day period in late November when the MJD/Webtel account processed approximately $4.7 million in Internet "sales," MasterCard contacted Heartland to report that it had received calls from three issuing banks regarding possible fraud by Webtel. On December 7, 1998, Heartland terminated the Webtel account.[41]

**37.** In September 1998, Ken Taves and Mr. Carr exchanged a series of e-mails concerning N–Bill account's overcharges. In his e-mails, Ken Taves acknowledged that the N–Bill account has experienced excessive charge-backs but suggested that JKP/Netfill was making every effort to improve its record.

**38.** For example, by changing merchant banks or merchant names, that merchant's chargeback record starts anew under the Visa USA chargeback monitoring program. Thus, even if the merchant had previously been flagged as a problem merchant by Visa USA, the next time that the merchant has excessive chargebacks, the merchant (under the new name or merchant account) will be listed as a first month offender under Visa USA's monitoring program. This way, a merchant can avoid "active monitoring" by Visa USA and avoid chargeback fees, at least initially.

**39.** The opening of the Heartland account coincided with JKP/Netfill's closing of its N–Bill account with Heartland.

**40.** As noted earlier in footnote 35, www.pureskin.com was also supposed to be JKP/Netfill's web site in 1998.

**41.** On December 8, 1998, Lee Sacks, former counsel for Ken Taves and his companies, contacted Heartland on behalf of MJD. Mr. Sacks requested the opportunity to discuss with Heartland "the events leading to the termination of [MJD's] merchant account." (Carr Depo. at 1090). Mr. Sacks went to Heartland's offices and requested, to no avail, that the MJD account be reopened. Around the same time, Ken Taves contacted Heather Bennett, the independent agent who submitted MJD's application to Heartland, to find out why Heartland had terminated the MJD/Webtel account.

On January 5, 1999, Charter Pacific advised MJD that a total of $48,200 in fees would be assessed to MJD's account for the November 1998 chargebacks. (Cornejo Depo. at 1614.) In addition, Charter Pacific required MJD to submit its chargeback reduction plan by January 7, 1999. (*Id.*) On January 11, 1999, four days after the Receiver took over the defendant companies, Charter Pacific closed the MJD account.

### Beginning Anew With TAL

In October 1998, as the MJD account was placed under the scrutiny of Visa USA's monitoring program, a new entity appeared. Like JKP, MJD and other defendant companies, TAL operated out of the offices at 22761 Pacific Coast Highway and shared the same employees. In December 1998, a merchant account for TAL was opened at Charter Pacific.[42] The merchant account agreement between TAL and Charter Pacific indicates that O'Bannon signed the agreement on behalf of TAL. (O'Bannon Depo. at 322.)

> On or about December 9, 1998, Ken Taves also learned that a representative from *GM* MasterCard had called and accused Online Billing, one of the fictitious business names used by JKP/Netfill or MJD, of stealing people's credit card numbers over the Internet and charging for services not rendered. Ken Taves was last seen at the Malibu offices on December 8 or 9, 1998.

42. The FTC did not cite to a copy of the merchant account application; and the Court did not find a copy of the application in the volumes of exhibits. Therefore, the Court does not know which individual actually applied for the account.

43. For the sake of convenience, the numbers in the chart have been rounded to the nearest hundred. For the accurate figures, see February 1999 Receiver's Report, FTC's Exhibit 28–A, at 1974.

Rappaport held himself out as a contact for TAL. Around the middle of December 1998, Rappaport told ATS that MJD's existing book of business, the portion that was then processed through the Charter Pacific merchant account, would be turned over to TAL. TAL was only in operation for a few weeks when the FTC filed this action.

### Problems With Consumers

In 1998 alone, over $49.4 million in "income" were deposited into JKP and MJD's merchant accounts at Charter Pacific and Heartland. Of this total, over $10.7 million were deposited at Charter Pacific ($6,145,431 in the JKP/Netfill account and $4,562,914 in the MJD account) and over $38.7 million were deposited at Heartland ($26,284,514 in the JKP/N–Bill account and $12,424,284 in the Webtel account). From bank records of the total monthly deposits into JKP and MJD's merchant accounts, the following monthly "sales" pattern for 1998 emerges: [43]

FTC Fact No. 99, which identifies the amounts that JKP and MJD deposited into their merchant bank accounts in 1998, relies on the declaration of Brick Kane, a principal of Robb Evans & Associates, who in turn cites the February 1999 Receiver's Report and bank statements in support of these figures. In their statement of genuine issues, Ken Taves, JKP and Herbal Care dispute FTC Fact No. 99 on the erroneous ground that the FTC had relied upon the ATS Historical Database (*see* definition in text, *infra*, at 1192–93) in reaching these calculations. (K. Taves, JKP and Herbal Care's Statement of Issues, No. 99.) Because the Receiver did not rely on the ATS Historical Database for these figures, the Court disregards these defendants' "dispute" and treats this fact as undisputed. The Court notes that FTC Fact No. 100 is similarly not in dispute, despite the defendants' contentions to the contrary, because the fact is based on the Receiver's review of bank statements and not the ATS Historical Database.

| | January | February | March | April | May | June |
|-------|-----------|----------|-----------|-----------|-----------|-----------|
| JKP | $830,400 | 962,200 | 1,870,400 | 3,119,500 | 2,224,700 | 4,991,600 |
| MJD | | | | | | 185,300 |
| Total $ | $830,400 | 962,200 | 1,870,400 | 3,119,500 | 2,224,700 | 5,176,900 |

| | July | August | September | October | November | December |
|-------|------------|-----------|-----------|-----------|------------|-----------|
| JKP | $5,510,500 | 5,865,500 | 6,060,200 | 991,500 | 3,600 | 80 |
| MJD | $ 757,800 | 664,900 | 887,400 | 3,563,300 | 10,129,200 | 799,300 |
| Total | $6,268,300 | 6,530,400 | 6,947,600 | 4,554,800 | 10,132,800 | 799,380 |

Such sales figures, if legitimate, are impressive indeed, given that the monthly web site membership fees were only $19.95. But JKP and MJD did not legitimately obtain the spectacular "sales."

It is clear from the undisputed evidence that these defendants billed the credit and debit card accounts of individuals from all over the United States *without authorization*. Typically, the purported consumers had never heard of or seen the defendants' business names before receiving their bank or charge card statements. Many victims called the toll-free telephone numbers listed next to the descriptor names on their statements to find out why they were charged $19.95.[44] To add to the confusion, when calls were answered, JKP, MJD or TAL customer service representatives used two additional fictitious names to greet customers—"Online Billing" or "Assist Online."

Unfortunately, many unhappy cardholders were unable to reach a live customer service representative to respond to their inquiries. Oftentimes the toll-free telephone lines were busy for long periods of time or rang without an answer. Some calls were answered by an automated voice mail system that did not identify the name of any company. Instead, the voice mail recording would ask callers to input their credit card numbers and press telephone keys to satisfy inquiries. Understandably, many people refused to give their credit card numbers to an anonymous or unknown entity. Other people were unable to leave messages because the voice mail system indicated that the voice mailbox was "full." Frustrated and fearful that their cards may have been stolen, many cardholders contacted their issuing banks and canceled their debit or charge cards.

JKP, MJD and TAL's customer service department[45] was overwhelmed with complaints. In February 1998, the customer service department had two employees. The complaints increased steadily during the year. Around April 1998, in response to the increased number of calls, more customer service representatives were hired. Towards the end of 1998, when the volume of complaint calls was at its highest, the customer service department had 12 or 13 representatives. At that time, thousands of calls were answered each day. Every customer service agent received 200 to 300 calls per day.

According to employees' estimates, more than 50% of the calls were from people who said they did not order the defendants' services and had no idea why they were billed. In addition, an astonishing 40% to 50% of the calls were from people who said they did not have a computer and had not given their card numbers to any-

44. Some cardholders were charged $19.95 for several months in a row.

45. The Court refers to a single customer service department because the evidence shows that JKP, MJD and TAL shared a single customer service department and used the same set of employees.

one. Not surprisingly in the scheme of things, the customer service agents' computer screens generally did not display consumers' street or e-mail addresses because such information was not available. Thus, the customer service representatives were unable to verify whether the complaining callers had actually signed up for any of the companies' Internet web sites.

In the summer of 1998, Ken Taves and Rappaport established a bank support department (and a separate telephone line) to respond to calls from card issuing banks and credit unions. The goal was to get the issuing banks to contact JKP, Netfill, N–Bill, MJD, Webtel or TAL directly (instead of going through the charge authorization networks) so that the defendants could issue credits. By issuing credits, these defendants could avoid the penalties and fees associated with chargebacks and reduce their exposure to the Visa USA chargeback monitoring program.[46] Rudy Pena, the employee that Ken Taves and Rappaport picked to head the bank support department, had no knowledge of the Truth in Lending Act, Electronic Fund Transfer Act or the credit card processing rules for Visa, MasterCard or Discover.

By August 31, 1999, the Charter Pacific and Heartland merchant accounts had processed over $6.8 million worth of charge-

backs and credits[47] (or 13.8% of the $49.4 million in "sales" proceeds deposited into the accounts). Visa USA's records show that JKP and MJD's merchant accounts' average chargeback rate for Visa cards in 1998, taken as a whole, is approximately 7.3%. (Elliot Decl. ¶¶ 14–15.) This rate is based on the following data: 120,425 chargebacks (totaling in excess of $2.6 million) processed out of 1,647,578 total Visa card transactions. (Id.)[48] This is "exceedingly high" when compared to the average Visa card chargeback rate of 0.80% for electronic commerce merchants, those classified as primarily Internet-based merchants. (Elliott Decl. ¶¶ 12–16.)

To date, there remain cardholders from all over the United States who complain that they have never been credited for unauthorized charges posted to their credit or debit card accounts by N–Bill, MJD and Webtel.[49] Some cardholders discovered the unauthorized charges too late; they were no longer able to obtain a credit through their card issuing banks. Undoubtedly, there are also cardholders who do not pay much attention to their statements and therefore never noticed the unauthorized charges.

### Amount of Damages

The FTC contends that the damages caused by the defendants' unauthorized

46. The defendant companies never disputed a chargeback.

47. $5,157,898 in chargebacks and $1,652,814 in credits. (Kane Decl. ¶ 4.) During oral argument, the FTC's counsel updated the total chargebacks and credits to the merchant accounts, providing the Court with a total of $7.3 million ($7,330,968 instead of $6,810,-712) through February 2000. Because the Court finds that a triable issue of fact exists concerning the amount of damages and the damages calculation presented in the briefs used the $6.8 million figure, the Court shall continue to refer to the former $6.8 million figure in the facts section rather than the updated $7.3 million figure.

48. Martin Elliott, the Program Manager of Visa USA's Merchant Chargeback Monitoring Program, opines that the 7.3% chargeback rate stated above may understate the number of consumer complaints to issuing banks be-

cause many issuers would have written off the charges without charging them back to the merchant bank. (Elliot Decl. ¶ 14.) As explained by Card Alert Services, the FTC's expert, processing a chargeback through the interchange system typically costs card issuers at least $20. (CAS Report at 2161.) If the challenged charge is less than the cost associated with processing the chargeback, issuing banks may simply absorb the cost of the charge in question instead of submitting it through the interchange system. (Id.)

49. The FTC submitted 17 cardholder declarations in support of this fact. See FTC Statement, Fact No. 93. During oral argument, the FTC's counsel stated that these 17 cardholders are representatives of a larger class of victims who have yet to obtain a credit for the unauthorized charges.

billing practices in 1998 amount to $40.5 million.[50] The FTC's calculation of damages relies in large part on information derived from historical databases maintained and produced by ATS. JKP, Herbal Care, Ken Taves and Teresa Taves challenge the authenticity and reliability of information obtained from ATS.

ATS maintained a historical database that purportedly recorded the transactions processed for JKP, MJD and TAL from January 1998 to the date the Receiver took over the defendant businesses (the "ATS Historical Database"). The database produced to the FTC contains the following information: transaction number, card number, transaction amount, transaction time and date, and associated merchant identification. It does not identify the names or addresses of any card holders whose accounts were being billed. Nor does the database identify the authorization numbers for any of the transactions.[51] ATS turned over this database to former defense counsel, Fried, Frank, Harris, Shriver, and Jacobson ("Fried, Frank"), on February 19, 1999. Four days later, the ATS Historical Database was turned over to the Receiver.

Apart from the ATS Historical Database, ATS maintained a customer database for TAL (the "TAL Customer Database"). This database contains customers' names and addresses in addition to the informa-

tion contained in the ATS Historical Database. Until January 4, 1999, three days before service of the complaint (and TRO) in this case, ATS allegedly also maintained a customer database for JKP and MJD which contained the names and addresses of the customers. During his deposition, Mr. Goldfarb testified that ATS turned over this database (on a CD–ROM) to former defense attorney Lee Sacks on January 4, 1999. Mr. Sacks testified in his deposition that he returned the CD–ROM to the defendants by leaving it on Ms. Ball's desk. However, Ms. Ball did not receive the CD–ROM and never had a conversation with Mr. Sacks concerning the delivery of the CD–ROM prior to this action. When the Receiver entered the defendants' business premises on January 7, 1999, it did not find the CD–ROM or any other documents/files that contain a listing of the JKP and MJD customers. Therefore, based on what the FTC was able to ascertain, the ATS Historical Database and the TAL Customer Database are the only existing records of the defendant companies' charge transactions maintained by or on behalf of the defendants.[52]

The ATS Historical Database purportedly contains records of 2,584,919 transactions (not card numbers) for the January 1998 to December 1998 period, totaling $47,512,530.[53] (CAS Report at 2162–63.) Card Alert Services, the FTC's expert,

---

**50.** The FTC has not submitted evidence concerning damages that may be attributed to the defendants' 1997 business activities.

**51.** "The absence of authorization numbers raises an inference that the transactions were not properly processed through the [interchange] system, or that the ATS data as submitted is not complete." (CAS Report at 2163.)

**52.** The absence of any other record of the defendants' business transactions—e.g., customer names, addresses or authorization numbers for approved transactions—is incredible insofar as the defendants would have the Court believe that they operated legitimate businesses. As FTC's expert states, "[i]n our experience with businesses involved in

high volume credit and debit card activity, such information is routinely kept by the businesses." (CAS Report at 2166–67.) Also, one would expect a legitimate Internet-based merchant to maintain a record of its customers' e-mail addresses and corresponding credit/debit card numbers. (See id.) However, neither the defendants nor their agents have such records, whether stored in computer files or on hard copies.

**53.** This number is $1,906,693 less than the total 1998 deposits to the Charter Pacific and Heartland merchant accounts—$49,417,-143—derived from a review of bank statements. Due to the lack of sufficient business records maintained by the defendant companies, the FTC claims it is unable to account for this difference.

found 912,125 credit and debit card numbers associated with the 2,584,919 transactions. (*Id.* at 2163.) Comparing the card numbers in the ATS Historical Database with the card numbers in the Charter Pacific Positive Database processed from August 1997 through June 1998,[54] Card Alert Services found that 752,602 cards that appear in the Charter Pacific Positive Database were used in ATS processed transactions *after* the card numbers first appeared in the Charter Pacific Positive Database. (*Id.* at 2165.) Based on this data, Card Alert Services concludes that 82.5% of the ATS processed cards (752,-602 out of 912,125) matched cards processed previously from a Charter Pacific merchant other than the defendant businesses. (*Id.*) When Card Alert Services compared the card numbers in the ATS Historical Database with the card numbers in the Charter Pacific Positive Database processed from August 1997 through October 1998, it found that 86% of the ATS processed cards (783,947 out of 912,-125) matched.[55] (*Id.* at 2165–66.) Again, this figure involves cards that were first processed in the Charter Pacific Positive Database and then processed in the ATS Database.

Card Alert Services opines that it is extremely unlikely that 783,947 cards out of 912,125 cards would coincidentally match a single database of 3.6 million cards processed through one merchant bank. (*Id.* at 2166.) The FTC's statistical expert, Dr. Martin Lee, agrees. Dr. Lee opines that the probability of this occur-

ring is "roughly equivalent to winning the grand prize in the California lottery every week for about 109,000 consecutive years." (Lee Report at 2194.) Such matches, along with other improbable correlations discussed in its report, led Card Alert Services to conclude that:

> [V]irtually all credit card numbers that the defendants billed as [their] own sales were, in fact, credit card numbers that [first] appeared in the [Charter Pacific] [P]ositive [D]atabase and which defendants appropriated for their own use. Rather than obtaining authorization for billing credit card numbers from cardholders who provided their card number[s] and authorized such charges, it appears that defendants accessed another source for valid credit card numbers, the [Charter Pacific] [P]ositive [D]atabase, and simply billed these credit card numbers without regard to authorization.

(CAS Report at 2166.)

Using the $47.5 million "sales" figure from the ATS Historical Database, the FTC concludes that a total of $3,357,552 can be linked to merchant identification numbers ("merchant IDs") associated with the defendant companies' web sites and $1,026,407 can be linked to merchant IDs associated with web sites that these defendants shared with third parties. Thus, $4,383,849 (or 9.2% of the $47,512,530 processed through ATS) possibly represent legitimate sales; and $43,128,681 ($47,512,-530–4,383,849) represent illegitimate gains.

---

**54.** As previously stated, JKP/Netfill obtained access to the Charter Pacific Positive Database in November 1997. The database contains valid credit card numbers processed in the prior 11 months. Therefore, JKP/Netfill should have had access to valid credit card numbers processed prior to August 1997. However, Charter Pacific apparently did not produce any database files that contain records of credit cards processed prior to August 1997. Of the two groups of Charter Pacific Positive Database files received by Card Alert Services, one covers cards processed from August 1997 through June 1998 and the other

covers cards processed from July 1998 through October 1998. (*Id.* at 2164.)

**55.** The Court notes that the CAS report neglects to emphasize at this point that the 912,125 cards processed through the ATS Historical Database supposedly include both credit *and* debit cards. (*Compare* CAS Report at 2163 *with id.* at 2166). Thus, to the extent this evidence is reliable, the number of credit cards ATS processed for the defendants should be less than 912,125. Accordingly, the correlation should be larger than 86% (because the numerator remains 783,947 but the

Using Charter Pacific and Heartland Bank records as well as sample issuing bank data, Card Alert Services concludes that approximately $2.3 million of the $4,383,849 in "legitimate" sales resulted in chargebacks and credits to customers. (*Id.* at 2172.) The FTC contends that the most reasonable calculation of damages caused by the defendants' unlawful business practices is $40.5 million.[56]

## Defendants' Assets & Transfers of Assets

The details of the defendants' assets and transfers of assets (both prior to the commencement of this case and after the TRO was issued) are well documented in the FTC's Statement, Fact Nos. 104 to 127. Because these facts are not controverted by the defendants and are supported by

denominator would be an amount *less* than 912,125).

**56.** The FTC obtained this figure by the following calculation: approximately $43.1 million in illegitimate gains (from the ATS Historical Database) + $2.3 million estimated chargebacks and credits (per Card Alert Services) + $1.9 million (the extra amount deposited into the merchant accounts but not reflected in the ATS Historical Database)–$6.8 million (total chargebacks and credits to date (based on the merchant bank statements)). Motion at 34–35. The Court questions the accuracy of this calculation. Card Alert Services reached the $2.3 million chargebacks and credits figure after reviewing Charter Pacific and Heartland's records and sample issuing bank data. (CAS Report at 2172.) The $6.8 million chargebacks and credits figure is obtained from the Receiver's review of the merchant bank statements. (Kane Decl. ¶¶ 4–5.) It therefore appears that the $2.3 million figure should be subsumed in the $6.8 million figure. In fact, the Court is puzzled as to why the FTC *added* the $2.3 million in its calculation in the first place since this figure is supposed to represent the amount that has already been returned to cardholders via credits and chargebacks.

During oral argument, the FTC's counsel explained that the $2.3 million chargebacks and credits are presumed to be illegitimate; therefore, the figure must be added to the damages calculation. The following is the Court's attempt to illustrate the FTC's calculation of damages:

| ATS Historical Database | | Merchant Accounts | |
|---|---|---|---|
| $ 47.5 mil. | total processed | $ 49.4 mil. | total deposited |
| < 4.4 mil.> | legit. sales | < 4.4 mil.> | legit. sales |
| 43.1 mil. | | 45.0 mil. | |
| 43.1 mil. | illegit. sales | 45.0 mil. | illegit. sales |
| + 2.3 mil. | presumed add'l illegit. sales (aka chargebacks & credits from the $4.4 mil. legit. sales) | + 2.3 mil. | presumed add'l illegit. sales (aka chargebacks & credits from the $4.4 mil. legit. sales) |
| + 1.9 mil. | add'l bank deposits | 47.3 mil. | total illegit. sales |
| 47.3 mil. | total illegit. sales | < 6.8 mil.> | total chargebacks & credits (refunded to consumers) |
| < 6.8 mil.> | total chargebacks & credits (refunded to consumers) | $ 40.5 mil. | total damages |
| $ 40.5 mil. | total damages | | |

However, there is a problem with the presumption that the $2.3 million represents additional illegitimate "sales." Since the FTC linked $4.4 million processed through the ATS Historical Database to presumably *legitimate* sales, the initial presumption concerning the $2.3 million in chargebacks and credits should *not* be a presumption of illegitimacy, *i.e.*, a presumption that they reflect fraudulent billing. Rather, unless there is evidence to the contrary, one should initially presume that the $2.3 million simply reflects the ordinary refunds that customers obtain, *e.g.*, they (1) changed their minds about subscribing to the defendants' web sites or (2) discovered that their children had used their credit/debit cards to subscribe to the web sites. *See, e.g.*, Ball Depo. at 35 ("We would get general cancellation calls. . . . [Some people] had subscribed for a free month and did not realize that they were going to be charged from that point on"); 38 (some calls to customer service were from people who simply complained that the "wrong amount" had been charged); Pena Depo. at 340 (some people called to say " 'my kid made this[;] I'm not going to pay it' "). The FTC has offered no evidence to support its claim that the $2.3 million must be additional illegitimate "sales" merely because they resulted in chargebacks and credits. Accordingly, the Court remains dubious about the accuracy of the FTC's calculation.

the evidence,[57] the Court incorporates them by reference as though stated herein. A brief summary of the transfers, however, is warranted.

The defendants transferred much of the ill-gotten gains from their activities to off-shore accounts. Between July 24, 1997 and November 11, 1998, a total of $25.3 million was transferred from the defendants through accounts held in the names of JKP, Discreet Bill and MJD to two entities—Media Buying Service ("MBS") and Phaeton Corporation ("Phaeton")—over which Ken Taves had control. Both MBS and Phaeton held accounts at Euro Bank in the Cayman Islands that were directly or indirectly controlled by Ken Taves. The transfers to MBS and Phaeton occurred either directly from the defendants to these accounts or through an intermediary known as MultiMedia West. Since January 7, 1999, the date the FTC served the defendants with the complaint and TRO, the defendants have transferred or caused to be transferred at least $21.6 million from accounts in their names or under their control to (1) other accounts in their name or in the name of third parties which are affiliated with the defendants or under their control; or (2) their former lawyers—Sacks & Zweig and Fried, Frank.[58]

Currently, the total known assets of the defendants covered by the TRO and pre-liminary injunction order are worth approximately $23.8 million. Of this total, around $17.4 million is located in overseas accounts which are currently frozen pursuant to legal actions taken by the Receiver. In addition, around $1.71 million is in frozen domestic accounts and assets, which

include a Cessna aircraft worth $140,000. The Receiver has also identified over $4.5 million in assets that appear to be covered by the TRO and Preliminary Injunction but have not yet been frozen. These assets include the Zumirez Drive property that was the subject of the May 1999 contempt hearings, a Cayman Island property, and $1.25 million in overseas accounts held in the names of third parties.

## III. Discussion

### A. Stay or Continuance of this Proceeding

#### 1. Fifth Amendment Right Against Self–Incrimination

Ken Taves asks the Court to stay these proceedings until his "pending criminal case" has been resolved or until "threat of any potential criminal prosecution no longer exists." (Opp. at 8, 12.) Ken Taves claims that he has asserted his Fifth Amendment right against self-incrimination because he is the "target of an active criminal prosecution arising from the same series of events that are at issue" in this case. (*Id.* at 12.) He argues that he cannot or should not be compelled to respond to the FTC's Statement because doing so would deprive him of his privilege against self-incrimination. At the same time, the corporate defendants contend that Ken Taves' inability to respond prevents them from opposing the Motion on the merits because Ken Taves is the only person with information that can assist their defense. Similarly, Teresa Taves argues that her husband's refusal to testify prevents her from properly opposing the

---

57. The only exception is Fact No. 125, which appears to contain an erroneous statement concerning the state of two properties—the Zumirez Property and a property located at Rum Point, Georgetown in the Cayman Islands. Fact No. 125 states that these two properties are currently frozen. However, both the Motion and the evidence cited in Fact No. 125 indicate that these two properties have not yet been frozen. (*See* Motion at 39; Kane Decl. at 1952.)

58. Fried, Frank has since returned the $225,-000 that it received from the defendants' off-shore accounts. Sacks & Zweig, however, has not returned the $60,000 that it received. A motion for an order to show cause why Lee Sacks should not be held in contempt is currently pending before another judge in this district.

Motion because he is her most important witness.

■ In general, the Constitution does not require a stay of civil proceedings pending the outcome of criminal proceedings. *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir.1995). " 'In the absence of substantial prejudice to the rights of the parties involved, [simultaneous] parallel [civil and criminal] proceedings are unobjectionable under our jurisprudence.' " *Id.* (quoting *Securities & Exchange Comm'n v. Dresser Indus.* ("*Dresser* "), 628 F.2d 1368, 1374 (D.C.Cir. 1980)) (original brackets). The decision whether to stay civil proceedings while a parallel criminal case is pending "is left to the sound discretion of the district court." *IBM Corp. v. Brown*, 857 F.Supp. 1384, 1387 (C.D.Cal.1994) (citing *Dresser*, 628 F.2d at 1375). The court's determination turns upon the " 'particular circumstances and competing interests involved in the case.' " *Keating*, 45 F.3d at 324 (quoting *Federal Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir.1989)). Specifically, the court should consider the following factors: 1) the interest of the plaintiff in proceeding expeditiously with this litigation and the potential prejudice to the plaintiff caused by a delay; 2) the burden which any particular aspect of the proceedings may impose on the defendant; 3) the convenience of the court in the management of its cases and the efficient use of judicial resources; 4) the interests of persons or entities not parties to the civil litigation; and 5) the interest of the public in the pending civil and criminal litigation. *Id.* (citing *Molinaro*, 889 F.2d at 903).

■ First, the Court considers the FTC's interest in proceeding expeditiously with this litigation, along with the interests of third parties whose activities or lives would be affected by the outcome of this litigation. As the record in this case shows, Ken Taves has a history of hiding and attempting to dispose of his assets. (*See, e.g.*, 5/4/99 & 5/5/99 Orders Re Con-

tempt.) Indeed, since the date the defendants were served with the complaint and TRO, Ken and Teresa Taves have transferred at least $21 million from accounts in their names or under their control to other accounts in their names or in the names of third parties who are affiliated with them or under their control. (FTC Statement, Fact No. 115.) Therefore, the FTC would be prejudiced by further delay. *See Molinaro*, 889 F.2d at 902. In addition, the cardholder-victims' interests in recovering the money defrauded by the defendants weigh against a stay. *See id.* This is particularly true when the case has been pending for over a year. Moreover, third-party card-issuing banks, merchant banks, and card associations are also prejudiced by the delay to the extent that they have had to make payments to cardholders on the defendants' behalf and yet cannot pursue claims against the defendants during the pendency of the receivership.

Second, the Court considers its interest in clearing its docket and the efficient use of resources. This case is now over fifteen months old. Moreover, as another court observed, "[a] stay would disrupt the court's calendar by indefinitely postponing trial" as the parties and the Court wait for the outcome of the government's case against Ken Taves. *IBM Corp.*, 857 F.Supp. at 1392. The Court finds that these factors weigh against a stay.

Finally, the Court considers the burden on Ken Taves. In May 1999, five months after the commencement of this action, the United States Attorney's Office issued a criminal complaint against Ken Taves.[59] However, the Court learned from the FTC's Reply that the government never indicted Ken Taves. Reply at 5. At the January 7, 2000 hearing on former defense counsel's motion to withdraw, defense counsel advised the Court that Ken Taves has been incarcerated at the MDC, since June or July 1999, solely on the Court's

---

**59.** The complaint was filed against Ken Taves on May 4, 1999. He was arrested the same day.

civil contempt orders. Because the Court did not hear otherwise from the parties, it proceeded to resolve this Motion with the understanding and belief that to date, there has been no operative criminal complaint, information or indictment filed against Ken Taves.[60]

The Court was dismayed, to put it mildly, when its court staff discovered well after the close of business on March 31, 2000, the Friday before the hearing on the Motion, that the criminal dockets reveal: (1) an indictment was filed against Ken Taves on *February 29, 2000,* charging Ken Taves with one count of criminal contempt under 18 U.S.C. § 401, and one count of false statement under 18 U.S.C. § 1001; and (2) Ken Taves entered a plea of not guilty on both counts on *March 6, 2000. See* Criminal Docket for *United States v. Kenneth H. Taves,* Case No. CR 00–187.[61] Nevertheless, the Court concludes that this factor—the burden on Ken Taves— does not require the Court to stay this civil action.

■ As stated by the district court in *IBM Corp. v. Brown:*

> [T]he contention that being forced to choose between the compulsion to testify in a civil suit in order to avoid an adverse result on the merits undermines the right to remain silent in a criminal matter, while having surface appeal, will not stand analysis. While the choice between testifying or invoking the Fifth Amendment may be difficult, . . . it does not create the basis for a stay.

857 F.Supp. at 1389 (quotations omitted). Here, the fact that Ken Taves has invoked his Fifth Amendment privilege does not, by itself, create a basis for stay. The Ninth Circuit recognizes that "[a] defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." *Keating,* 45 F.3d at 326. Indeed, "[n]ot only is it permissible to conduct a civil proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding." *Id.* (citing *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)).

In addition, the burden on Ken Taves' Fifth Amendment privilege is minimal here. The criminal charges relate to acts that occurred *after* the commencement of this civil case. Count One of the indictment alleges that "[o]n or about April 26, 1999," Ken Taves "knowingly and willfully" violated the Court's TRO and preliminary injunction order "by maintaining with Euro Bank Corporation, George Town, Grand Cayman, accounts in his own name, and accounts which he controlled in the names of [others], and failing to transfer the funds on deposit in such accounts to an account in the United States . . . ." Indictment, *United States v. Kenneth H. Taves,* at ¶ 4.[62] Count Two alleges that "[o]n or about January 9, 1999," Ken Taves "knowingly and willfully" made a false represen-

---

**60.** The Court advised the parties of this understanding in the February 8, 2000 minute order. (*See* 2/8/00 Minute Order ("The Court is aware that Defendant Taves is currently incarcerated solely for contempt of court. . . . Under the circumstances, the Court intends to consider these motions as soon as possible and plans to give them priority over other civil motions on the calendar").) The Court also indicated that it might resolve the motions on the papers without oral argument. (*See id.* ("If the Court decides that oral argument would assist the Court, the Court will notify the parties . . .").)

**61.** Although none of the parties advised the Court of these facts, the Court hereby takes judicial notice of the information contained in the criminal dockets of the Central District of California. *See* Fed.R.Evid. 201.

**62.** During oral argument, the Court asked counsel for a copy of the indictment. After the hearing, the FTC submitted a copy of the indictment to the Court pursuant to the Court's request. The Court hereby takes judicial notice of the indictment. *See* Fed.R.Evid. 201.

tation to the FTC by submitting "a financial statement under penalty of perjury that was materially false, in that it failed to disclose that [Ken Taves] held or controlled accounts at Euro Bank Corporation ... which had on deposit approximately $25.3 million." *Id.* at ¶ 6. The central issues in the criminal case (*e.g.,* whether Ken Taves violated the Court's orders or made a false statement to the FTC after this action was filed) appear unrelated to the central issues in the underlying civil case (*e.g.,* whether Ken Taves and the other defendants' actions prior to the commencement of this case constitute unfair and deceptive business practices). Therefore, there is little, if any, need for Ken Taves to invoke his Fifth Amendment privilege with respect to questions concerning his actions prior to January 6, 1999.

Even if there remains some overlap between the present criminal and civil proceedings (*i.e.,* the government decides to bring additional criminal charges against Ken Taves that arise from the activities at issue here), the Court still finds that the burden on Ken Taves' Fifth Amendment privilege, if forced to testify in this case, is minimal. As the record shows, Ken Taves has testified at a deposition and submitted sworn statements in prior proceedings in this case. Where a defendant already has provided deposition testimony on substantive issues of the civil case, any burden on that defendant's Fifth Amendment privilege is "negligible." *Molinaro,* 889 F.2d at 903; *see IBM Corp.,* 857 F.Supp. at 1390. Moreover, nothing prevents Ken Taves (and the other defendants purportedly dependant on him) from responding with information that does not tend to incriminate him, *e.g.,* business records that show his companies were legitimate operations. Further, Ken Taves and the other defendants "have made no effort to dem-

onstrate to the court how truthful testimony [possibly] subject to [Ken Taves' Fifth Amendment] privilege in this case could be helpful to [them] in their defense on the merits." *IBM Corp.,* 857 F.Supp. at 1390. Under the circumstances, any difficulty that Ken Taves may encounter from testifying and any difficulty that the other defendants may encounter from Ken Taves' decision to remain silent do not outweigh the other interests favoring denial of the stay request.[63] After considering all the factors, the Court denies the defendants' request for a stay.

### 2. Continuance Pursuant to Rule 56(f).

■ Ken Taves and the corporate defendants also request, in the alternative, that the Court continue or deny the Motion (presumably without prejudice) pursuant to Federal Rule of Civil Procedure 56(f). The defendants' request is without merit.

Rule 56(f) provides that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). The party seeking additional time for discovery under Rule 56(f) must, among other things, articulate a plausible basis for believing that specific discoverable facts exist which, if adduced, will give rise to genuine issues of material fact. *See, e.g., C.B. Trucking, Inc. v. Waste Management, Inc.,* 137 F.3d 41, 44 (1st Cir.1998); *Committee for the First*

---

**63.** Ken Taves' reliance on the Court's July 20, 1999 order staying discovery against him is misplaced. At the time, the case was only seven months old. (*See* 7/20/99 Minute Order at 4 ("At this point, the Court's docket is not really a factor in terms of the effects of a delay").) Simply put, the circumstances have changed in the ensuing eight months. *See Molinaro,* 889 F.2d at 903 (A district court must consider the "circumstances presented to [it] when the motion [to stay] was made").

*Amendment v. Campbell,* 962 F.2d 1517, 1522 (10th Cir.1992); *International Short-stop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1266–67 (5th Cir.1991); *Airs Int'l Inc. v. Perfect Scents Distributions, Ltd.,* 902 F.Supp. 1141, 1145 (N.D.Cal.1995). Ken Taves and the corporate defendants do not even attempt to make such showing. *See* Opp. at 12–13. They simply contend that they need a continuance until Ken Taves' pending criminal investigation is resolved so that he "may then be able to respond on his own behalf and on behalf of the corporate defendants." *Id.* In other words, this Rule 56(f) request is based solely on Ken Taves' continued assertion of the Fifth Amendment privilege. This is improper. Moreover, as stated by another court in a similar situation: " 'There is no reason to grant a continuance to a litigant who has personal and intimate knowledge of the underlying facts for the purported purpose of conducting discovery to ascertain those identical facts.' " *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 899 F.Supp. 974, 984 (E.D.N.Y. 1994) (civil RICO action involving a defendant who invoked the Fifth Amendment privilege with respect to the underlying facts).[64] The Court denies the request for a Rule 56(f) continuance.

## B. Summary Judgment Standard

The party who moves for summary judgment has the burden of establishing that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978). If the moving party has the burden of proof at trial—the plaintiff on a claim for relief, or the defendant on an affirmative defense—the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calder-*

*one v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (citing W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). This means that if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [that party's] favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) (original emphasis). Furthermore, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings . . . [T]he adverse party's response . . . *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

---

**64.** The Court notes that its July 20, 1999 order only stayed discovery—interrogatories and depositions—against Ken Taves. (*See* 7/20/99 Minute Order at 5.) Nothing prevent-

ed Ken Taves and the other defendants from conducting discovery, to the extent anything beyond their knowledge or control may be necessary to adequately defend this case.

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 248, 106 S.Ct. 2505; *Griffeth v. Utah Power & Light Co.*, 226 F.2d 661, 669 (9th Cir.1955).

## C. Unfair Practices

Section 13(b) of the FTC Act provides that the FTC may obtain a permanent injunction against practices that violate the FTC Act. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir.1994). In addition, section 13(b) gives the courts the " 'authority to grant any ancillary relief necessary to accomplish complete justice.' " *Id.* Such ancillary relief includes an order for restitution. *Id.*

### 1. Liability for Unfair Practices

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce[.]" 15 U.S.C. § 45(a). An act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n); *accord Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1363–66 (11th Cir.1988); *FTC v. Windward Marketing, Ltd.*, 1997 U.S. Dist. LEXIS 17114, *29–30 (N.D.Ga. Sept. 30, 1997). Thus, to find unfairness, the injury must satisfy three tests: (1) it must be substantial; (2) it must not be outweighed by countervailing benefits to consumers or competition; and (3) it must be one that consumers themselves could not reasonably have avoided. *Orkin Exterminating Co.*, 849 F.2d at 1364 (citing FTC's 1980 Policy Statement); *Windward Marketing*, 1997 U.S. Dist. LEXIS 17114, *30–31. One district court has found that debiting consumers' bank accounts without the consumers' authorization constitutes an unfair practice under the FTC Act. *Windward Marketing*, 1997 U.S. Dist. LEXIS 17114, *37–38.

The substantial injury prong can be satisfied if the FTC establishes that consumers were injured by a practice for which they did not bargain. *Id.* at *31; *cf. Orkin Exterminating Co.*, 849 F.2d at 1364–65. Injury may be sufficiently substantial if it causes a small harm to a large class of people. *Windward Marketing*, 1997 U.S. Dist. LEXIS 17114, *31–32 (citing *American Fin. Services v. FTC*, 767 F.2d 957, 972 (D.C.Cir.1985)). The second prong of the test is easily satisfied "when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." *Id.* at *32; *cf. Orkin Exterminating Co.*, 849 F.2d at 1365. With regard to the third prong of the test, the focus is on "whether consumers had a free and informed choice that would have enabled them to avoid the unfair practice." *Windward Marketing*, 1997 U.S. Dist. LEXIS 17114, *32 (citing *American Fin. Services*, 767 F.2d at 976); *accord Orkin Exterminating Co.*, 849 F.2d at 1365. " 'Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end.' " *Orkin Exterminating Co.*, 849 F.2d at 1365 (quoting *FTC v. Orkin Exterminating Co.*, 108 F.T.C. 341, 366 (1986)).

#### a. Corporate Defendants JKP, Herbal Care and MJD

##### (1) Common Enterprise

Preliminarily, the Court addresses whether the corporate defendants operated a common enterprise. In the arguments portion of the Motion, the FTC does not make a distinction between Herbal Care, on the one hand, and JKP and

MJD, on the other.[65] The FTC contends that the defendants should be held liable as a common enterprise because no distinction exists among these entities. (Motion at 47.) *See, e.g., Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir.1964) (where "the same individuals were transacting an integrated business through a maze of interrelated companies[,] ... 'the pattern and frame-work of the whole enterprise must be taken into consideration'" and the companies may be held liable as a joint enterprise); *FTC v. Wolf*, 1996 WL 812940, \*8, 1997–1 Trade Cases ¶ 71,713 (S.D.Fla. Jan.31, 1996) (a common enterprise exists where "the thirty corporate defendants are commonly controlled, share office space and officers, conduct their business through a maze of interrelated companies, commingle corporate funds, and .... [n]othing in the evidence shows a real distinction between the corporate defendants"). Defendants found to be a common enterprise are held "jointly and severally liable for the injury caused by their violations of the FTC Act ...." *Wolf*, 1996 WL 812940, \*8.

The Court agrees that Herbal Care, JKP and MJD were part of a common enterprise. The uncontroverted facts show that the corporate defendants were under the common control of Ken Taves, shared office space, employees, and officers, and conducted their businesses through "a maze of interrelated companies" purportedly operating the same web sites. In sum, the evidence shows there was no real distinction among the companies. Therefore, to the extent that JKP and MJD are found to have violated the FTC Act, Herbal Care will be held jointly and severally liable.

### (2) The Unfair Practices

 In this case, the corporate defendants essentially concede that they engaged in unfair business practices in

violation of the FTC Act. MJD filed no opposition to the Motion. Herbal Care and JKP did not even attempt to argue that the uncontroverted facts do *not* show that the defendants' activities constitute unfair practices. Nevertheless, for the sake of establishing a complete record, the Court will briefly discuss the corporate defendants' liability for unfair practices.

Even without relying on the ATS Historical Database, the uncontroverted evidence overwhelmingly demonstrates that the defendants participated in a billing scheme by submitting unauthorized charges for processing. Some of the key facts are highlighted below:

- The corporate defendants are interrelated entities that shared a common enterprise.
- In a single year, the corporate defendants utilized at least five different merchant accounts and four fictitious business names to process over $40 million in credit and debit card transactions.
- The timing of each new merchant account application coincides with the impending threat of being placed on Visa USA's "active monitoring" list for excessive chargebacks.
- Ken Taves began transmitting thousands of supposedly authorized debit/credit card numbers to ATS for processing around the same time JKP/Netfill obtained access to the Charter Pacific Positive Database.
- From November 1997 through December 1998, the defendants had access to more than 3 million valid Visa and Mastercard credit card numbers from the Charter Pacific Positive Database.
- By submitting the charges and debits for processing, the defendants represented to the issuing/merchant banks that they obtained authorization from

---

**65.** As noted in the facts section, Herbal Care's only "business" in 1997 and 1998 consisted of paying the salaries of JKP employees, pur- portedly after JKP transferred money to Herbal Care.

the cardholders for the charges and debits.

- An untold number of consumers could not reach a live customer service representative from the defendant companies to relay their complaints.

- At one point, the defendants' customer service department received thousands of consumer complaint calls a day.

- More than 50% of the calls received by the customer service department were from people who said they did not order anything from the defendants and had no idea why they were billed.

- A shocking 40% to 50% of the calls received by the defendants were from people who said they did not have a computer and had not given their card numbers to anyone.

- Approximately 7.3% of the Visa card transactions submitted by the corporate defendants in 1998 resulted in chargebacks. This figure reflects over 120,000 Visa card chargebacks totaling over $2.6 million.

- The defendants' merchant bank statements show approximately $6.8 million in chargebacks and credits have been processed. This amount represents 13.8% of all "sales" proceeds deposited into the defendants' merchant accounts.

As the Program Manager of Visa USA's Merchant Chargeback Monitoring Program aptly puts it:

> The combination of very high chargeback rates, merchant name changes, unanswered telephone calls to customer service, the pattern of chargebacks among the Taves-affiliated entities over time, and customer complaints of unauthorized charges by a series of Taves-affiliated merchants [leads one to conclude that the defendant businesses were committing fraud against innocent cardholders.]

(Elliott Decl. ¶ 19.) Moreover, the only reasonable inference the Court can draw from the corporate defendants' access to the Charter Pacific Positive Database and the timing of the defendants' fraudulent billing practices is that the defendants stole and processed Visa and MasterCard numbers from the database. Further, the Court finds that the complete absence of the ordinary indicia of a legitimate business, much less a high volume credit/debit card-dependent Internet business, for companies that supposedly processed over $49 million in sales in a single year, is further evidence that the defendant companies did not run legitimate operations.[66] In the absence of any evidence offered by the defendants to controvert these facts, the Court concludes as a matter of law that (1) defendants JKP, Herbal Care and MJD engaged in the unfair practice of operating a fraudulent scheme by which they debited and charged card numbers without the cardholders' authorization; (2) such practice resulted in substantial injury; and (3) the practice was not outweighed by any benefits to consumers or competition.

#### b. Individual Defendants

▮ Individual defendants may be held liable for injunctive relief for the corporate defendants' violations of the FTC Act if the FTC demonstrates that the individual defendants participated directly in the wrongful acts or practices *or* had authority to control the corporations. *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir.1997) (citing *FTC v. American Standard Credit Sys., Inc.*, 874 F.Supp. 1080, 1087 (C.D.Cal.1994)). "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy." *American Standard Credit Sys.*, 874 F.Supp. at 1089 (citing *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573–74

---

**66.** Such records include, for example: customer lists; customer e-mail or street addresses; and transaction records showing credit/debit card numbers linked with customer names, authorization codes, and web sites used.

(7th Cir.1989)). An individual's status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control. *Publishing Clearing House*, 104 F.3d at 1170.

To be held liable for restitution, the FTC must show, in addition to the above, that the individual defendants had knowledge that the corporation or one of its agents engaged in the wrongful acts or practices. *Id.* at 1171. To satisfy the knowledge requirement, the FTC must establish that the individual defendant either: (1) had actual knowledge of the wrongful acts or practices; (2) was recklessly indifferent to whether or not the corporate acts or practices were fraudulent; or (3) had an awareness of a high probability that the corporation was engaged in fraudulent practices along with an intentional avoidance of the truth. *See id.* (citing *American Standard Credit Sys.*, 874 F.Supp. at 1089) (individual liability for misrepresentations or deceptive practices under the FTC Act); *Windward Marketing*, 1997 U.S. LEXIS 17114, *39 (individual liability for unfair practices under the FTC Act). The FTC does not need to show that an individual defendant intended to defraud consumers in order to hold that individual personally liable. *Publishing Clearing House*, 104 F.3d at 1171.

### (1) Ken Taves

The undisputed facts set forth above show without a doubt that Ken Taves actively participated in the unlawful practices, controlled the day-to-day operations of the corporate defendants, and had

actual knowledge of the unlawful practices. Indeed, the record shows that he is the key player in the billing scheme—the common denominator that ties all the pieces of the puzzle together. The Court finds that the FTC has established that (1) Ken Taves is individually and jointly liable for the corporate defendants' unfair practices;[67] and (2) the FTC may obtain injunctive relief against and restitution from Ken Taves.

### (2) Teresa Taves

Teresa Taves' opposition argues that genuine issues of material fact exist as to whether Teresa Taves has the sufficient degree of involvement and/or knowledge of the alleged unlawful practices. The Opposition identifies portions from the deposition testimony of Randall Ball, David Goldfarb, Robert Carr, Michael Kenner and, of course, Teresa Taves, to show that Teresa Taves had little involvement with the daily operations of JKP and little or no knowledge of the contents of the documents that she signed. As the Court noted in the summary of facts section, these facts are really not in dispute. After thoroughly evaluating the evidence, the Court finds that the FTC is entitled to summary judgment against Teresa Taves.

The FTC relies on *Publishing Clearing House*, 104 F.3d 1168, in support of its argument that Teresa Taves should be held liable for the misconduct of the corporate defendants. Motion at 50–51. In *Publishing Clearing House*, the FTC sued Publishing Clearing House ("PCH"), a telemarketing business operated by an indi-

---

67. Although the FTC does not expressly make this argument in the Motion, the Court finds that Ken Taves is directly liable for his own unfair practices. *See Windward Marketing*, 1997 U.S. Dist. LEXIS 17114, *38 ("individual defendants are directly liable for their own violations"); 15 U.S.C. § 45(a)(2) ("The [FTC] is ... empowered and directed to prevent *persons*, partnerships, or corporations ... from using unfair or deceptive acts or practices in or affecting commerce") (emphasis added); Amended Complaint (Ken Taves is sued individually and as an officer of the defendant companies). The undisputed facts establish that (1) Ken Taves engaged in the unfair practice of operating a fraudulent scheme by which he debited and charged card numbers without the cardholders' authorization; (2) such practice resulted in substantial injury; and (3) the practice was not outweighed by any benefits to consumers or competition.

vidual named Robbin McLaurin, for violating section 5 of the FTC Act. Working from a script, PCH's telephone solicitors told people that they had won one of several prizes. 104 F.3d at 1169. The solicitors then told the potential consumers that they could claim the prizes by making a tax-deductible donation to one of two charities, one of which was H.O.P.E. *Id.* The PCH solicitors made numerous misrepresentations to consumers upon which the consumers relied to their detriment.

Defendant Lorin Martin became the president of PCH at the direction of McLaurin. *Id.* As president of PCH, Martin applied for PCH's business licence. *Id.* Acting on behalf of PCH, she also signed an agreement with H.O.P.E. *Id.* at 1171. In addition, H.O.P.E.'s application to conduct charitable solicitation listed Martin as the individual " 'in direct charge of conducting the solicitation.' " *Id.* She worked at PCH's offices for only one week, answering telephone calls and handling routine office duties. *Id.*

On the FTC's summary judgment motion, the district court held that Martin, as president of PCH, was individually and jointly liable with PCH for the over $360,000 that consumers had donated. *Id.* at 1170. The district court ordered restitution of that amount and permanently enjoined PCH and Martin. *Id.* Martin appealed. *Id.* The Ninth Circuit rejected Martin's argument and affirmed the district court's order granting summary judgment.

First, the Ninth Court found that "Martin's assumption of the role of president of PCH and her authority to sign documents on behalf of the corporation demonstrate

that she had the requisite control over the corporation." *Id.* at 1171. The court reached this ruling because Martin had offered no evidence to controvert the FTC's showing of control. *Id.*[68]

Second, in determining whether Martin had the requisite knowledge, the Ninth Circuit specifically noted that Martin had previously worked for McLaurin as a telephone solicitor at the National Clearing House ("NCH"), another telemarketing operation formerly operated by McLaurin. *Id.* at 1170, 1171. NCH had ceased operations due to criminal fraud investigations. *Id.* at 1170. PCH telephone solicitors used a script that was practically identical to the script used by NCH. *Id.* Thus, the record showed that Martin acted on behalf of PCH at the direction of someone she knew was facing criminal charges concerning similar telemarketing activities. Based on this background, the court found that Martin was "at least recklessly indifferent with regard to the truth or falsity of the misrepresentations made by PCH employees." *Id.*

Here, the Court finds that the case against Teresa Taves is more compelling than the case against Martin in *Publishing Clearing House*, but not on the same grounds reached in that case. On the issue of authority to control, a genuine issue of material fact may exist. Unlike *Publishing Clearing House*, here, Teresa Taves does offer some evidence in the form of deposition testimony concerning her alleged lack of control over JKP's operations. However, whether such evidence creates a genuine issue of fact for trial need not be answered by the Court. As stated in the legal section, *supra*, the FTC

---

68. Specifically, Martin argued that she filed PCH's business application as the president of PCH "only because McLaurin had convinced her that he could not legally open a telemarketing business in his name due to pending criminal charges." *Id.* She also argued that she only answered telephones for a week at PCH, which should negate the evidence on control. *Id.*

The court noted that:

However, other than statements in the appellate brief, Martin has never offered any evidence to support these factual assertions. Her affidavit filed in opposition to summary judgment made no mention of these facts.... [C]onclusory, self-serving statements in appellate briefs .... are insufficient to create a genuine issue of material fact.

*Id.*

need not show authority to control to prevail on this element. Alternatively, if the undisputed facts show that Teresa Taves participated directly in the wrongful acts or practices, she can be held individually liable for JKP's unfair practices.

Like Martin in *Publishing Clearing House*, Teresa Taves was an officer of a defendant corporation who signed documents on behalf of the corporation. But Teresa Taves' involvement as an officer of JKP was not as limited as Martin's involvement as an officer in PCH. Teresa Taves was not an officer in name only; JKP was the Taveses' company. From the time of their marriage to the end of 1998, Teresa Taves had worked in companies owned by her husband or the two of them. While she was not active in the day-to-day operations of the companies, she did draw a salary. Indeed, in 1998 alone, she was paid around $1.7 million by Herbal Care for her role as an owner and officer of JKP. The fact that she claims she did not know how this sum was calculated is irrelevant.

In addition, Teresa Taves actively participated in certain acts crucial to the success of JKP/Netfill's billing scheme, namely, using her credit to obtain merchant bank accounts at Charter Pacific and Heartland and signing the agreement to purchase the Charter Pacific Positive Database. The record shows that Charter Pacific had previously rejected Ken Taves' application for a merchant bank account because of his bad credit record. In approving the merchant bank applications, the banks relied on Teresa Taves' credit history and the representations made in the numerous accompanying documents that she signed.[69] These merchant account applications enabled the company that she owned with her husband to perpetrate the fraud against innocent cardhold-

ers. Also, Charter Pacific's acceptance of JKP's application enabled JKP to purchase Charter Pacific's credit card database. Absent evidence to the contrary, the corporate defendants' access to the 3 million valid Visa/MasterCard credit card numbers in this database was a necessary part of the billing scheme. In sum, Teresa Taves played an integral role in the commitment of unfair practices by the corporate defendants.

The heart of her argument is that she had no knowledge of the nature of her participation and the illegal activities of the other defendants. She attempts to hide behind the shield erected by her claims that she did not read the documents that she signed. For purposes of the summary judgment motion, the Court accepts as true that she did not read most of the documents that she signed.[70] Nevertheless, as the Court detailed in the factual background section, *supra*, the evidence does show she was aware of the nature of JKP's businesses, the necessity of merchant bank accounts, and the nature of her participation.

Moreover, similar to Martin in *Publishing Clearing House*, Teresa Taves "acted at the direction of someone she knew" had previously run into trouble with the law. Teresa Taves admitted that she knew, before 1995, that her husband had faced a murder charge in 1988 involving a victim who was a financial or business associate. She also admitted that she knew, before 1995, that her husband had some unspecified criminal problems before they were married. Additionally, she signed numerous contracts, bank documents and letters making various warranties and representations on behalf of JKP without reading the contents of the documents. Having worked in a bank for five years, working

---

**69.** The Court does not rely on the two documents that Teresa Taves claims may not contain her signature. *See* T. Taves Opp. at 7.

**70.** Given that she was aware that she submitted merchant bank applications on behalf of

JPK, she must have "read" some of the relevant documents, even if just to glance at the headings, to reach that conclusion. (*See* text, *supra*, at 1183–84.)

first as a teller, then a chief teller and later in the loan department, Teresa Taves must have been aware of the legal significance of her actions. She certainly had ample opportunity to review the details of all the documents that she signed. Indeed, by simply reading the May 22, 1998 letter to Charter Pacific that she signed, · she would have learned that JKP/Netfill was closing the account because it needed to "implement better fraud control systems and procedures." (T. Taves Depo. at 768–69 [authenticating signature], 868 [letter].) The fact that she had just applied for the Heartland merchant account shortly before sending this letter certainly should have raised a red flag as to JKP's activities. She had ample opportunity to take action and discover the fraud. But she intentionally avoided learning the truth, comfortable with the huge $4 million income that her family suddenly "earned" after years of failed business ventures. Based on the undisputed facts, the Court finds as a matter of law that Teresa Taves was, at a minimum, recklessly indifferent with regard to whether or not the corporate acts or practices were fraudulent. Therefore, she is individually liable for the corporate defendants' unlawful practices and is subject to injunctive relief and any order of restitution.

### (3) Maurice O'Bannon

■ *The FTC Motion.* [71] Preliminarily, the Court notes that O'Bannon's opposition concedes that he once served as an officer of MJD, Discreet Bill and TAL, and in that capacity, he signed and filed start-up documents on behalf of MJD, Discreet Bill and TAL. (Opp. at 2; O'Bannon Motion at 1–2.) Thus, whether or not some of these corporate documents were signed by O'Bannon personally or by someone else (at Nevada Corp.) who used his signature stamp is irrelevant. (*See* text, *supra*, at 1185–86.) In addition, O'Bannon has admitted that he signed the fictitious business name statements concerning N.-Bill, Online Billing, Webtel and Assist Online. (*See id.*) Therefore, the only possible authentication issue that may arise concerns whether or not he signed the December 1998 merchant bank agreement on behalf of TAL. (*See id.* at 1185, note 24.)

The FTC's Motion against O'Bannon is premised on its contention that O'Bannon's role, however temporary, as an officer and director of MJD, Discreet Bill and TAL, and his act of signing documents on behalf of these companies, without more, is sufficient to support a finding that O'Bannon had the requisite control under *Publishing Clearing House.* Reply at 1187–88. As discussed above, the ruling in that case turned on the fact that defendant Martin did not point to any evidence to contradict the FTC's evidence of control over the corporation. *See Publishing Clearing House,* 104 F.3d at 1170. Here, however, O'Bannon does point to some evidence that raises an issue of fact as to whether he had the requisite control over the companies, *e.g.,* he denies knowing Ken Taves and others, he denies knowing anything about the corporate defendants and he claims he was only an officer and director on paper.[72] The FTC has not established that it is entitled to judgment against O'Bannon as a matter of law.

*The O'Bannon Motion.* O'Bannon argues that there is an absence of evidence to support the FTC's case. O'Bannon contends that the FTC's evidence shows he only temporarily acted as an officer for

---

**71.** The Court rejects O'Bannon's suggestion that he cannot adequately oppose the Motion because the FTC's Motion cites to exhibits submitted in support of its application for a temporary restraining order and motion for a preliminary injunction, which were filed in early 1999, but never served on O'Bannon. None of those exhibits supports the FTC's case against O'Bannon.

**72.** The Court notes that the FTC did not argue that O'Bannon should be liable for the corporate defendants' unlawful practices because he participated directly in the unlawful acts. (Reply at 20.) Instead, the FTC only argued that O'Bannon had the requisite control. (*Id.*)

MJD, Discreet Bill and TAL, he had no actual authority over these companies, he resigned shortly after each corporation was formed, he did not know the other individual defendants and did not receive any compensation from the companies. (O'Bannon Motion at 2.) Notably, O'Bannon does not mention the Charter Pacific merchant account agreement that indicates O'Bannon signed a legal contract on behalf of TAL in or about December 1998.

First, contrary to O'Bannon's contention, the evidence shows that he was not always a "temporary" officer for the companies. In fact, the corporate documents indicate that he was an officer and director of Discreet Bill, at least on paper, for *13 months*—from March 1998 (O'Bannon Depo. at 306) to April 1999 (O'Bannon Motion, Ex. C [Resolution of the Board of Directors of Discreet Bill]). During the interim, O'Bannon, on behalf of Discreet Bill, signed the four fictitious business name certificates. (O'Bannon Depo. at 307 [N–Bill in 9/98]; 308 [Online Billing in 9/98]; 309 [Webtel in 12/98]; 310 [Assist Online in 12/98].) Second, it appears that O'Bannon signed the Charter Pacific merchant account agreement on behalf of TAL and he may have done so in or about December 1998, after he purportedly resigned from the company. That merchant account agreement enabled TAL to continue the fraudulent scheme, albeit only for about a month before the Receiver took over the company.

Nevertheless, the Court finds that O'Bannon is entitled to judgment in his favor. The FTC's case against O'Bannon is based solely on O'Bannon's role as an officer of the defendant companies. Therefore, to hold O'Bannon liable for injunctive relief, the FTC must establish that O'Bannon either participated directly in the wrongful practices at issue or had authority to control the corporation.

The FTC contends that O'Bannon's role as an officer or director *on paper*, without more, sufficiently shows authority to control or, at the very least, sufficiently shows that O'Bannon's Motion should be denied. The Court disagrees. At this stage, to successfully oppose this motion, the FTC must have enough evidence "on which a reasonable jury could reasonably find for [the FTC]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. But the record submitted by the FTC is devoid of evidence that shows O'Bannon even knew any of the other defendants (or their agents) or communicated in any way with any of other defendants (or their agents). Without some other evidence linking O'Bannon to the other defendants, the evidence simply shows that an unwise man signed certain documents from afar on behalf of companies unknown to him without knowledge about (1) who actually owned or operated those companies or (2) the business activities of those companies.

The Court is very troubled by the nature of O'Bannon's activities, lending his name and signature to faceless and unknown corporations and signing documents without care for their content or legal effect. The record shows that O'Bannon did not merely act as an officer and director for strange companies for the limited purpose of signing incorporation documents. The Court is also skeptical about O'Bannon's claim that he received little or no benefit from Nevada Corp. in exchange for his "services." However, the FTC did not prosecute O'Bannon independently for unlawful practices unrelated to the defendants' billing scheme. In this case, there is simply insufficient evidence for a reasonable jury to find that O'Bannon actually had authority to control the defendant corporations.[73] Accordingly, the Court con-

**73.** The FTC has not alleged that O'Bannon participated directly in the wrongful billing scheme perpetrated by the other defendants. Even if it did, the Court finds that there is insufficient evidence on which a reasonable jury could find for the FTC. The FTC's strongest evidence in this regard is the TAL/Charter Pacific merchant account agreement. However, O'Bannon claims that the document contains his signature stamp, *i.e.,* someone

cludes that O'Bannon is entitled to judgment as a matter of law on the FTC's claims against him.[74]

## 2. Scope of the Injunction

### a. Ken Taves

 Ken Taves objects to the scope of the requested injunction. Specifically, he contends that the proposed injunction would "permanently enjoin [him] from operating any business" that accepts credit or debit cards, which "effectively prohibits [him] from ever engaging in a position of ownership, management or control." (Opp. at 16.) He also contends that he would not be able to lawfully support himself (and presumably his family) or pay any restitution, if the requested relief is granted. (Id. at 17.)[75]

The relevant portions of the FTC's proposed order, submitted on November 29, 1999, states:

> IT IS FURTHER ORDERED that for a period of ten years from the date of this order, Ken Taves, whether directly, in concert with others, or through any business, entity, corporation, subsidiary, division or other device, is enjoined from owning or controlling, whether directly or directly, holding a managerial post, consulting for, or serving as an officer in any business that handles consumers' credit card or debit card accounts, or the information therefrom[.]

(Proposed Order at 7 (Section VI).) Two paragraphs later, the proposed order provides that:

> [N]othing in this part shall prohibit Ken Taves from being an employee of a business that handles consumers' credit card or debit card accounts, or the information received therefrom, provided that Ken Taves has no contact or access, directly or indirectly, with or to these credit card or debit card accounts or any information derived from them.

(Id.)

The Court recognizes that "those caught violating the FTC Act can expect some 'fencing in'" Windward Marketing, 1997 U.S. Dist. LEXIS 17114, *43 (quoting FTC v. National Lead Co., 352 U.S. 419, 431, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957)). " 'The[ ] "fencing in" provisions are needed to prevent similar and related violations from occurring in the future.' " Id. (quoting Trans World Accounts, Inc. v. FTC, 594 F.2d 212, 215 (9th Cir.1979)). With this in mind, the Court finds that Ken Taves' unscrupulous and unlawful practices, which he successfully carried out for over a year largely because of his position of control over his companies and other individuals, warrant the ten year prohibition against owning, controlling, holding a managerial position, consulting for, or serving as an officer in "any business that handles consumers' credit card or debit card accounts, or the information therefrom[.]" (Proposed Order at 7 (Section VI at ¶1).)

signed his signature to the document. The FTC has submitted no evidence to the contrary. Even viewing this document combined with the fictitious business name filings, the Court cannot conclude that a triable issue of fact exists as to whether O'Bannon participated directly in the corporate defendants' unlawful practices.

**74.** The Court need not distinguish between the FTC's unfair practice claim and the deceptive practice claim. As stated above, O'Bannon's liability for the unlawful acts is premised on his role as an officer or director of MJD, Discreet Bill and TAL. Because the Court finds that the FTC has insufficient evidence to proceed to trial on the issues of

control and direct participation, O'Bannon is entitled to judgment on both claims.

**75.** None of the defendants, including Ken Taves, object to the other provisions of the proposed injunction—Sections I to V. Those provisions would permanently enjoin Ken Taves, Teresa Taves, JKP, Herbal Care and MJD from engaging in the particular unlawful practices at issue in this case and requiring them to take certain actions in connection with the "advertising, promotion, offering for sale, or sale of goods or services by any means whatsoever" to ensure that debits or charges to cardholder accounts occur only with express authorization from the cardholders. (See Proposed Order at 3–7.)

However, the provision that limits Ken Tave's *employment as a non-mangerial employee* is unwarranted.[76] Although the requested relief does not on its face prohibit Ken Taves from working at all,[77] it does effectively prohibit him from working in the overwhelming majority of businesses. There are few businesses nowadays that accept only cash or checks and few, if any, positions in businesses that do handle credit or debit cards where the (non-managerial) employee can avoid having contact with or even *access to* customers' card account information.[78] Instead, the Court will adopt the first two paragraphs of the proposed ban (*see* Proposed Order at 7) but substitute the third paragraph for the following language:

> Provided, further, that nothing in this part shall prohibit Ken Taves from being an employee of a business that handles consumers' credit or debit card accounts, or the information received therefrom, as long as Ken Taves does not use any of those credit or debit card accounts, or any information derived therefrom, for any purpose other than the lawful and legitimate processing of a credit or debit card transaction that is expressly authorized by the cardholder for goods sold or services provided by Ken Taves' employer.

#### b. Teresa Taves

Teresa Taves did not object to the scope of the injunction against her. Although she did "join" in all other defendants' arguments, no one else addressed the specific ban against her, namely, she must obtain a surety bond in the amount of $4,000,000 before she can engage in any of the activities proscribed by sections I to V of the proposed order (which allow lawful "advertising, promotion, offering for sale, or sale of goods or services by any means whatsoever" as long as she takes certain steps to ensure that debits or charges are expressly authorized). (*See* Proposed Order at 8 (Section VII).) The Court finds a $4,000,000 bond is unwarranted. Instead, the Court will require a $500,000 bond.

#### 3. Damages on the Unfair Practices Claim

JKP, Herbal Care, Ken Taves and Teresa Taves contend that the FTC's calculations on damages—total of $40.5 million—are based on unreliable evidence. The defendants' expert, Jon Karraker, CPA, questions the reliability of the ATS Historical Database, upon which much of the calculations are based, because, *inter alia,* (1) Mr. Goldfarb apparently turned over the database records to the FTC in three batches over a seven month period from January through July 1999 [79]; (2) the FTC has not independently verified the accuracy of the ATS data (by reviewing other merchant databases maintained by ATS); (3) Mr. Goldfarb's credibility is in doubt because he is an interested party and the evidence suggests or shows that Mr. Goldfarb knew of or participated in the unlawful practices; and (4) there is the $1.9 million discrepancy between the $47.5 million "sales" figure from the ATS Historical Database and the $49.4 million "sales" deposits in the merchant bank accounts (and

**76.** None of the cases cited by the FTC supports this proposed ban. (*See* Motion at 54 & Reply at 15 (cases all ban defendants from engaging in the particular unlawful activities at issue, *e.g.,* engaging in future telemarketing businesses or selling investments that include an interest in government licenses).)

**77.** For example, Ken Taves can work as an employee in a business that (1) accepts only cash or checks or (2) accepts credit and debit cards as long as he has "no contact or access, directly or indirectly, with or to these credit card or debit card accounts or any information derived from them."

**78.** Outside of "businesses," there are professions that might not handle credit or debit card account information (*e.g.,* lawyers, teachers, and engineers), but those positions require certain educational training and/or professional background which Ken Taves likely does not have and cannot easily obtain.

**79.** The FTC does not dispute this fact. *See* Reply at 9–13.

the FTC includes this $1.9 million in the damages calculation). (Opp., Ex. A [Karraker Report] at 1–5). After reviewing the deposition testimony of David Goldfarb, the evidence in support of the FTC damages calculations, and Mr. Karraker's report, the Court had questions about the reliability of the FTC's evidence on damages. *See* Fed.R.Civ.P. 56(e) (evidence in support of a summary judgment motion must be admissible).

Therefore, on March 23, 2000, the Court issued a minute order to the parties, asking that counsel address the following points during oral argument:

(1) Is the FTC's evidence on damages dependent on Mr. Goldfarb's credibility as a witness?

(2) Did the FTC agree to not prosecute Mr. Goldfarb and/or ATS or make any other promises to Mr. Goldfarb in exchange for Mr. Goldfarb's cooperation?

(3) Do the defendants have any evidence of collusion or wrongdoing by Mr. Goldfarb (*i.e.*, that Mr. Goldfarb tampered with the databases he turned over to the FTC) other than mere speculation?

(4) If the Court finds that it has concerns about Mr. Goldfarb's credibility as a witness, does that necessarily cast some doubt as to the reliability of the ATS databases such that the issue of damages cannot be determined on summary judgment?

(5) As to the $1.9 million discrepancy between the $47.5 million total "sales" figure from the ATS Historical Database and the $49.4 million total "sales" deposits in the corporate defendants' merchant bank accounts—what evidence in the record shows the $1.9 million is illegitimate?

(6) Is the FTC's calculation overstated by at least $2.3 million? (*See* discussion, *infra*, note 56.)

During oral argument, counsel addressed these points at length. For the first time, the FTC proposed an alternative method of calculating damages not previously raised in its moving or reply papers. The FTC proposed that the Court disregard the ATS Historical Database and simply use the $49.4 million total deposits in the defendants' merchant accounts. The FTC asserts that $49.4 million equals the total amount of unauthorized charges because the defendants have no evidence that indicates these were authorized transactions. After subtracting the total chargebacks and credits to date ($7.3 million as of February 2000), the total amount of damages should be $42.1 million. The FTC argues that two cases, *FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir.1996) and *FTC v. Febre*, 128 F.3d 530 (7th Cir.1997), support this alternative method of calculation. After considering counsel's oral argument, the record in this case and the two cases cited by the FTC, the Court finds that under either of the FTC's proposed methods of calculation, a triable issue of fact exists as to the amount of damages. Accordingly, the Court concludes that the FTC is not entitled to judgment as a matter of law on the damages issue.

## IV. Conclusion [80]

For all of the foregoing reasons, the Court hereby ORDERS that (1) the FTC's Motion is GRANTED, in part, on the issue of liability as to JKP, Herbal Care, MJD, Ken Taves and Teresa Taves; (2) the FTC's Motion is DENIED, in part, on the issue of damages with respect to JKP, Herbal Care, MJD, Ken Taves and Teresa Taves; (3) the FTC's Motion against

[80] The FTC also argues that the defendants violated section 5 of the FTC Act by committing "deceptive practices." (Motion at 44–46.) The Court finds that even if the FTC establishes liability on this claim, the forth-coming injunction and restitution order for the unfair practices would not be broader in scope. Therefore, the Court concludes that it need not address this argument.

O'Bannon is DENIED; and (4) the O'Bannon Motion is GRANTED.

**SO ORDERED.**